**In re BROOKLYN NAVY YARD ASBESTOS LITIGATION (Joint Eastern and Southern District Asbestos Litigation).**

No. 1197 *, Docket 91–9325(L) *.

United States Court of Appeals, Second Circuit.

Argued April 21, 1992.

Decided June 30, 1992.

\* See appendix for additional calendar and docket numbers.

832

Steven J. Phillips, New York City (Alani Golanski, Moshe Maimon, Levy, Phillips & Konigsberg, of counsel), for plaintiffs-appellees-cross-appellants Rose Failla, Joanna Baumann, Helen Dacey, Carolyn Foglia, Vendura L. Foglia, Dominick Fusco, Eileen Granelle, Mollie Minan, Ann Pesce, Eugene Schepis, Kenneth Alexander Sandberg,

Morris Thierman, Nancy Thierman, Arnold Sherman Whitten, Catherine Whitten, David Shopkorn, Charlotte Shopkorn and Katherine Falteisek, for plaintiff-appellant Goldie Feldman, and for plaintiffs-appellants-cross-appellees Perrell V. Barone and Roberta Barone.

Jerry Kristal, Greitzer & Locks, New York City, of counsel, for plaintiffs-appellees Thomas P. Walsh and Teresa Walsh, and for plaintiffs-appellees-cross-appellants Bertram S. Bermar, Rita Liebson, Vernon Green, Salvatore Tecchio and Rose Tecchio.

John A. Collins, Michael Ponterio, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Buffalo, N.Y., of counsel, for plaintiffs-appellees-cross-appellants Ronald P. Bellizzi, Michael J. Boland, Mary Ellen Boland, Vincent Lentini, Connie Lentini, Joan Wilson Newton, Leonard Saks, Evelyn Saks, Lorraine Apt, Annette Epstein and Lucia Ferraiuolo.

Abby J. Resnick, Sullivan & Liapakis, New York City, of counsel, for plaintiffs-appellees-cross-appellants John Caliendo, Mary Caliendo, Hilda Ehrlich, John Morgan, Rose Morgan, Gregory Pirozzi, Audrey Pirozzi, Phyllis E. Yardley, Michael Rafaniello and Florence Rafaniello.

Jay W. Dankner, Lipsig, Sullivan & Liapakis, New York City, of counsel, for plaintiffs-appellees-cross-appellants Santo Fiumano, Larry Gewirts, Abe Goldberg and Paula Goldberg.

Louis C. Woolf, Knoxville, Tenn. (Baker, Worthington, Crossley, Stansberry & Woolf, of counsel), for defendant-appellant-cross-appellee Owens–Illinois, Inc.

Frank Santoro, Joyce A. Lagnese, Danaher, Tedford, Lagnese & Neal, Hartford, Conn., of counsel, for defendants-appellants-cross-appellees Pittsburgh Corning Corp. and Fibreboard Corp.

Andrew T. Berry, Newark, N.J. (Richard P. O'Leary, McCarter & English, of counsel), for defendants-appellants-cross-appellees Owens–Illinois, Inc. and Keene Corp.

David Henry Sculnick, Steven Sold, Gordon & Silber, New York City, of counsel, for defendant-appellant-cross-appellee Manville Personal Injury Settlement Trust.

Before: OAKES, Chief Judge,
LUMBARD and WALKER, Circuit Judges.

OAKES, Chief Judge:

## BACKGROUND

From the 1930's through 1966, thousands of workers at the New York Naval Shipyard, commonly known as the Brooklyn Navy Yard (BNY), breathed air laden with carcinogenic asbestos fibers. Manufacturers of the asbestos-containing products used at BNY did not warn users of the hazards posed by asbestos dust. Nor did the Navy warn its workers of those hazards, despite its own knowledge of the danger of asbestos. Decades after exposure, many of these workers found themselves with asbestos-related injuries—lung cancer, colon cancer, mesothelioma, laryngeal cancer, pleural disease, asbestosis.

New York amended its statute of limitations in 1986 to start the running of the statute from discovery of the disease. New York Toxic Tort Reform Act of 1986, L.1986, ch. 682, § 2 (codified at N.Y.C.P.L.R. § 214–c (McKinney 1990)). The legislation explicitly revived previously barred asbestos actions. L.1986, ch. 682, § 4, *reprinted after* N.Y.C.P.L.R. § 214–c (McKinney 1990). Prior to 1986, the New York statute of limitations ran from the date of exposure. *See In re Joint Eastern & Southern Dist. Asbestos Litig.; Maiorana v. Owens–Corning Fiberglas Corp.,* 964 F.2d 92, 93–94 (2d Cir.1992). New York's state and federal courts were soon inundated with previously barred asbestos suits. Of several thousand jointly managed asbestos actions filed in the Eastern District of New York, the Southern District of New York, and the Supreme Court of the State of New York, roughly six hundred involved workers exposed to asbestos at BNY. The BNY cases were consolidated by a joint federal-state order. Through the efforts of Referee and Settlement Master Kenneth R. Feinberg, and under the supervision of Judge Jack B. Weinstein and Justice Helen E. Freedman, most

of the BNY plaintiffs settled most of their claims.

The BNY cases heading for trial were divided into three categories: Phase I for cases in which over 90% of plaintiffs' asbestos exposure occurred at BNY; Phase II for cases in which 50% to 90% of exposure occurred there; and Phase III for the remainder. The sixty-four Phase I cases were tried jointly in federal court before Judge Weinstein.[1] Later, the fifteen Phase II and Phase III cases went to consolidated trial, before the same judge and jury. The trials were handled with utmost care to ensure that the jurors could assimilate the vast amounts of information necessary to assess the claims. *See In re Eastern & Southern Dists. Asbestos Litig.*, 772 F.Supp. 1380, 1386 (E. & S.D.N.Y.1991) (describing jury selection, documentary materials provided to jurors, interim summations and charges, and other procedures designed to enhance efficiency and juror performance). In Phase I, after four months of trial and four weeks of deliberation, the jury rendered fifty-two verdicts in favor of plaintiffs, with damages in excess of thirty million dollars, and twelve verdicts for the defense. In Phases II and III, the jury returned twelve plaintiffs' verdicts, with damages over seven million dollars, and three defense verdicts. The jury awarded no punitive damages, but found every company that shipped asbestos-containing products to BNY liable to at least some plaintiff for failure to warn workers of asbestos's health hazards.

Judge Weinstein then embarked upon the tortuous course charted by New York statutes for molding those jury verdicts into judgments. *See* N.Y.C.P.L.R. arts. 14 and 16 (McKinney 1976 & Supp.1992), 50 and 50–B (McKinney 1963 & Supp.1992); N.Y.E.P.T.L. § 5–4.3(a) (McKinney Supp. 1992); N.Y.G.O.L. § 15–108 (McKinney 1989). These computations determined how the judgments would be affected by

settlements and bankruptcies, as well as the assessment of prejudgment interest.

Defendants now appeal, arguing that plaintiffs' evidence of causation was insufficient as a matter of law and that the court failed adequately to instruct the jury regarding the doctrine of superseding cause, and challenging a number of the court's interpretations and applications of New York's verdict-molding statutes. Plaintiffs cross-appeal, challenging among other things the court's decision to exclude their design defect claim, and, like defendants, criticizing various of the district court's verdict-molding decisions. In addition, two individual plaintiffs raise issues in addition to those raised by the plaintiffs as a group. Plaintiff Feldman urges that the jury's finding that her husband did not die from asbestos-related illness was against the weight of the evidence, warranting a new trial; plaintiffs Barone attack their pain and suffering award as shockingly low.

## DISCUSSION

After addressing several issues concerning the conduct of the trial, we will turn to the heart of the appeal—issues concerning the molding of the verdicts under New York law. Lastly, we will consider the individual appeals of plaintiffs Feldman and Barone.

### I. *Trial Issues*

#### A. Causation

■ First, defendants argue that plaintiffs' proof of causation was insufficient as a matter of law. They point not to the medical aspect of causation, but rather to product identification. Defendants contend that plaintiffs failed to identify the exact manufacturers whose products injured each plaintiff, and that New York law requires such proof in a products liability action.

---

1. Interestingly, the propriety of joint trials in this mass tort case is not questioned by plaintiffs or defendants. Of course, this is a different issue from that of the propriety of class actions in this type of case.

The unique procedures utilized in this case are among the many innovations Judge Weinstein has brought to the whole court system in connection with so-called "mass torts." We believe that he is to be applauded for his innovative managerial skills.

We have addressed the identical argument twice before, first in *Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990), and more recently in *O'Brien v. National Gypsum Co.*, 944 F.2d 69 (2d Cir.1991), each time finding proof of causation sufficient in the absence of identification of the precise product that injured a given plaintiff. Each of those cases involved asbestos exposure at BNY. In dealing with the BNY asbestos cases, it would have defied reason to require each plaintiff to prove causation as specifically as defendants suggest. We therefore upheld a jury's finding of causation in *Johnson* based on the circumstantial evidence that the defendants' asbestos-containing products were present on particular ships and that asbestos fibers were " '[a]ll over the deck.' " 899 F.2d at 1286. And in *O'Brien* we upheld the jury's causation finding based on evidence that the decedent died from an asbestos-related disease, and "testimony that asbestos products were used interchangeably on virtually all of the warships under construction in the Navy Yard." 944 F.2d at 73; *see also Roehling v. National Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1228 (4th Cir.1986) ("We disagree with the district court that direct evidence is needed showing that [plaintiff] identified the asbestos products or that the witnesses knew, had contact with, or recognized [plaintiff] as being on the job site. Such burden is unreasonable."); *Lockwood v. AC & S, Inc.*, 109 Wash.2d 235, 246–47, 744 P.2d 605, 612 (1987).

In considering a contention that the evidence was insufficient to support plaintiffs' claim, we view the evidence in the light most favorable to the plaintiffs. *O'Brien*, 944 F.2d at 72 (citing *Michelman v. Clark–Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976)). Viewed in that light, the evidence at trial established that asbestos-containing products made by the defendants were used interchangeably throughout the shipyard, and that the environment was extremely dusty with asbestos fibers. The plaintiffs proved that they or their decedents spent time at BNY and were exposed to asbestos there, that defendants' asbestos-containing products were used in the shipyard and contributed to the asbestos fibers in the air, and that they developed diseases medically linked to asbestos exposure. Because the events happened years ago, and many of those exposed to the asbestos are deceased, to require precision of proof would impose an insurmountable burden. *See Lyons v. DeVore*, 39 N.Y.2d 971, 972, 387 N.Y.S.2d 108, 108, 354 N.E.2d 848, 848 (1976) (mem.) (" 'precision' of proof cannot always be expected or required" in death cases). As we see no reason to overrule *Johnson* and *O'Brien* in favor of a stricter standard of causation, we find plaintiffs' proof sufficient to support the jury's finding that plaintiffs' injuries were caused by exposure to asbestos from defendants' products.

### B. Navy's Intervening Failure to Warn

The evidence at trial showed that the United States Navy knew of the dangers of asbestos exposure but, with single-minded focus on building warships expeditiously, failed to warn its workers or take available precautions, such as ventilating work areas, wetting down the insulation, or requiring that workers wear respirators. Plaintiffs, as naval employees, were barred under the workers' compensation statute from pursuing a tort remedy against the United States. *See* N.Y.Work.Comp.Law § 11 (McKinney 1992). Defendants, however, advance two arguments premised on the Navy's culpability. First, they contend that the sophistication of the Navy as an intermediary relieved manufacturers of their duty to warn the naval employees. Second, they argue that even if the defendants had a duty to warn, the Navy's failure was a superseding cause of plaintiffs' injuries, relieving defendants of liability.

We find no merit in defendants' contention that they justifiably relied on the Navy to communicate potential hazards to those who would ultimately work with defendants' asbestos-containing products. The jury found—unsurprisingly—that de-

fendants had a duty to warn users of the dangers associated with their products. Given that the record supports neither a finding that defendants actually relied on the Navy to warn its workers, nor a finding that any such reliance would have been justifiable, the presence of the Navy as an alleged "sophisticated intermediary" or "knowledgeable user" does not call into question the jury's finding of defendants' duty to warn. *See* Restatement (Second) of Torts § 388, cmt. n (1965). The sophisticated intermediary doctrine protects a manufacturer from liability only if the chain of distribution is such that the duty to warn ultimate users should fall on an intermediary in that chain, rather than on the manufacturer. *See, e.g., Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 62–63, 423 N.Y.S.2d 95, 97–98 (1979) (applying responsible intermediary theory to relieve drug manufacturer of liability where the prescribing physician should have warned the user of the product's dangers), *aff'd,* 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980); *Rivers v. AT & T Technologies, Inc.,* 147 Misc.2d 366, 372, 554 N.Y.S.2d 401, 405 (Sup.Ct.1990) (relieving bulk chemical manufacturer of liability to ultimate user where user was "too remote in the chain of distribution" and manufacturer "provided extensive warnings to its immediate distributees and each of the parties in the chain of distribution was a responsible intermediary").

■ Unlike the sophisticated intermediary theory, defendants' superseding cause argument assumes a duty to warn but suggests that an intervening cause broke the causal chain connecting plaintiffs' injuries to defendants' breach of that duty. Defendants assert that the district court failed adequately to instruct the jury regarding superseding cause. In *McLaughlin v. Mine Safety Appliances Co.,* 11 N.Y.2d 62, 71–72, 226 N.Y.S.2d 407, 413–14, 181 N.E.2d 430 (1962), the New York Court of Appeals held that the trial court should have charged that a firefighter's failure to warn a nurse of the hazard of unwrapped heat blocks could have superseded the defendant manufacturer's negligence in failing to print an adequately visible warning on the heat blocks' packaging. More recently, the New York Supreme Court, Appellate Division, reversed a plaintiff's verdict where the trial judge refused to instruct the jury that if the decedent's employer had actual knowledge of the hazards of trichloroethylene vapors, its negligence in failing to warn its employee or to provide him with breathing apparatus may have constituted a superseding cause, relieving the chemical manufacturer and distributor of liability for their own failure to warn. *Billsborrow v. Dow Chem., U.S.A.,* 177 A.D.2d 7, 17–19, 579 N.Y.S.2d 728, 734–35 (1992).

In the present case, however, Judge Weinstein's charge was adequate. Judge Weinstein reminded the jury that defendants introduced evidence concerning the Navy's knowledge of asbestos hazards and failure to warn its employees, and instructed the jury that proximate cause would be lacking if, because of a breach of duty by the Navy, "a warning by defendants would have had no appreciable effect in protecting the workers." While the charge was neither as thorough nor as clear on the question of superseding cause as it might have been, it sufficed to alert the jury to the possibility of finding that the Navy's conduct interrupted the causal chain between defendants' failure to warn and plaintiffs' injuries. If the jury had concluded that the Navy was fully responsible for plaintiffs' injuries, it would have known from the district court's charge to absolve the defendants.

■ In any event, the absence of a precise, emphatic instruction on superseding cause was at most harmless error. To supersede a defendant's negligence, an intervening cause must be neither normal nor foreseeable. *Woodling v. Garrett Corp.,* 813 F.2d 543, 555 (2d Cir.1987); *Lynch v. Bay Ridge Obstetrical & Gynecological Assocs.,* 72 N.Y.2d 632, 636, 536 N.Y.S.2d 11, 13, 532 N.E.2d 1239, 1241 (1988); Restatement (Second) of Torts § 442 (1965). An intervening act breaks the causal nexus only if it is "extraordinary under the circumstances, not foreseeable in the normal course of events." *Derdiarian*

*v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 670 (1980). The Navy's conduct in failing to protect its workers from the hazards of asbestos exposure, while reprehensible, was anything but unforeseeable. The record shows that the Navy's use of asbestos-containing products at BNY, and the constantly dusty conditions there, were unhidden and widely known. The district court charged the jury that, to find a defendant liable, it must determine that the defendant "actually was or should have been aware that its products, *when used as the manufacturer would reasonably foresee it would be used in the Navy Yard,* could cause injury to those exposed to the dust from the product." (Emphasis added.) Thus, the jury necessarily found that defendants knew or should have known that the Navy did not maintain a safe workplace and did not adequately warn its workers. The Navy's intervening failure to warn was entirely foreseeable; there is nothing unjust in holding defendants liable for their own negligence, notwithstanding the Navy's additional lapse. *See Woodling,* 813 F.2d at 556 ("[T]he fact that the intervening actor, such as an employer who controls defective machinery, knows of the dangers and merely fails to warn or otherwise protect the plaintiff does not of itself relieve the original actor from liability.").

### C. Design Defect Claim

The district court limited plaintiffs' case to a failure to warn theory, despite plaintiffs' desire to present a design defect case as well. The court formalized its decision as a partial summary judgment as to the design defect theory in favor of all defendants. The court, taking judicial notice of the records of prior cases, found that the asbestos products "were furnished according to specifications and were essentially off the shelf items." This finding, the court determined, placed defendants within the protection of the government contractor's defense and therefore warranted summary judgment on the design defect claim.

 When a military contractor manufactures a product in accordance with government specifications, federal law protects the manufacturer from state law design defect liability. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988) ("Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."); *In re Joint Eastern & Southern Dist. New York Asbestos Litig.; Grispo v. Eagle–Picher Indus. (Grispo)*, 897 F.2d 626, 629 (2d Cir. 1990). The military contractor's defense is premised on federal displacement of state law where state law significantly conflicts with the federal interest embodied in the federal government's sovereign immunity for discretionary functions. *Boyle,* 487 U.S. at 511, 108 S.Ct. at 2518; *see* 28 U.S.C. § 2680(a) (1988) (excepting from the Federal Tort Claims Act's consent to suit "[a]ny claim based upon ... the exercise or performance ... [of] a discretionary function or duty on the part of a federal agency or an employee of the Government"). The present defendants, all of whom were government contractors providing asbestos insulation products in accordance with detailed government specifications, could not be held liable for the design of their products, and the court properly limited plaintiffs' case to the failure to warn theory. *See Boyle,* 487 U.S. at 513–14, 108 S.Ct. at 2519–20; *see also St. Louis Baptist Temple, Inc. v. FDIC,* 605 F.2d 1169, 1171–72 (10th Cir.1979) (district court may take judicial notice of its own records of prior litigation in deciding motion for summary judgment); *Federal Election Comm'n v. Hall–Tyner Election Campaign Comm.,* 524 F.Supp. 955, 959 n. 7 (S.D.N.Y.1981) ("any facts subject to judicial notice may be properly considered in a motion for summary judgment"), *aff'd,* 678 F.2d 416 (2d Cir. 1982), *cert. denied,* 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983). Indeed, we recently recognized in a BNY asbestos case that the military contractor's defense can

protect a manufacturer from design defect liability while leaving it exposed to liability for failure to warn:

> [I]t is not unreasonable to imagine that, as in this case, government contracts often may focus upon product content and design while leaving other safety-related decisions, such as the method of product manufacture or the nature of product warnings, to the contractor's sole discretion. In these instances, state law design requirements are displaced, although state law warning requirements are not.

*Grispo*, 897 F.2d at 631.

We are mindful, moreover, of the difficulties faced by a trial court in managing a complex, multi-plaintiff, multi-defendant mass tort litigation. While the corresponding desirability of streamlining litigation cannot justify dismissing valid claims, it does suggest the particular appropriateness of taking advantage of the summary judgment mechanism to dispose of claims that, although adequately pleaded, must fail as a matter of law. As the Supreme Court instructed in *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." (Footnote omitted.) The district court's decision not to allow plaintiffs to pursue their design defect claim—a decision warranted by defendants' design immunity as government contractors—helped guide this litigation to a speedy and just resolution. *Cf.* American Law Institute, Complex Litigation Project, Tentative Draft No. 2, at 14 (April 6, 1990) ("In order to allow for the most efficient handling of complex multiparty actions, the transferee court must be given maximum flexibility to design and structure the litigation in light of the particular issues and parties involved."). *But cf.* Mark A. Peterson & Molly Selvin, *Mass Justice: The Limited and Unlimited Power of Courts*, Law & Comtemp. Probs., Summer 1991, at 227, 246 (criticizing tendency of appellate courts reviewing mass

tort litigation to "allow trial judges far broader power to make decisions than in ordinary tort litigation so long as the trial court can dispose of the mass litigation").

### D. Evidentiary Rulings

Plaintiffs contend that certain evidentiary rulings prejudiced their ability to prove that punitive damages should be awarded and that the defendants engaged in reckless and concerted misconduct. Proving recklessness or concerted action, plaintiffs argue, would have allowed them to take advantage of joint and several liability notwithstanding New York Civil Practice Law and Rules section 1601's limitation on the liability of defendants whose fault is fifty percent or less. *See* N.Y.C.P.L.R. §§ 1601, 1602(7) and 1602(11) (McKinney Supp.1992). The evidence at issue—the Roemer deposition, the Sumner Simpson papers, and certain Manville documents—was excluded pursuant to Federal Rule of Evidence 403.

■ Rule 403 allows a trial judge to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. That decision is left to the sound discretion of the trial judge, and we will not reverse a decision to exclude evidence under Rule 403 unless it constitutes an abuse of discretion. *United States v. Williams*, 596 F.2d 44, 50 (2d Cir.), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979). In this lengthy trial, the court was properly vigilant in curtailing the presentation of tangential or cumulative evidence, and did not abuse its discretion.

### E. Concerted Action

■ At trial, plaintiffs attempted to prove that defendants Owens–Illinois and Owens–Corning Fiberglas acted in concert. Proof of in-concert action would have subjected the companies to joint and several liability. N.Y.C.P.L.R. § 1602(11) (McKinney Supp.1992). When the jury found that

the two companies had not acted in concert, plaintiffs sought judgment notwithstanding the verdict or, in the alternative, a new trial on the issue. The district court denied the motions. On appeal, plaintiffs argue that the jury's finding was unsupportable, and that the denial of their motion for judgment or a new trial was therefore error. We disagree.

Plaintiffs did present evidence showing that the two companies worked together in the sale of asbestos-containing "Kaylo" insulation products. Specifically, the proof showed that Owens–Illinois supplied Kaylo to Owens–Corning Fiberglas. For instance, plaintiffs presented as evidence an advertisement for Kaylo Heat Insulation, which insulation was manufactured by Owens–Illinois and distributed by Owens–Corning.

■ However, concert of action requires more than a supply relationship. It requires jointly undertaken tortious conduct. *See Bradley v. Firestone Tire & Rubber Co.*, 590 F.Supp. 1177, 1180 (D.S.D. 1984) (rejecting "concert of action" tort liability in absence of joint tortious conduct); Restatement (Second) of Torts § 876 cmt. b (1979). Plaintiffs here established only that the companies sold the products together, not that they worked together in concealing health issues or in failing to warn. The record does not show " 'in addition to a parallel course of conduct among defendants, evidence of some agreement— express or tacit—a common plan among manufacturers not to test adequately or not to warn of dangers that were known.' " *Bradley*, 590 F.Supp. at 1180 (quoting *Ryan v. Eli Lilly & Co.*, 514 F.Supp. 1004, 1016 (D.S.C.1981)). The jury's conclusion that evidence of jointly undertaken tortious conduct was lacking is fully supportable, and the district court properly denied plaintiffs' motions. *See Armstrong v. Commerce Tankers Corp.*, 423 F.2d 957, 959 (2d Cir.) (Judgment as a matter of law "will be granted only if ... the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against

him."), *cert. denied,* 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970); *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.) (A new trial may be granted for verdict against the weight of the evidence only if " 'it is quite clear that the jury has reached a seriously erroneous result.' ") (quoting *Borras v. Sea–Land Service, Inc.*, 586 F.2d 881, 886–87 (1st Cir.1978)), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *Billiar v. Minnesota Mining & Mfg. Co.*, 623 F.2d 240, 247–48 (2d Cir.1980) (A reviewing court will not set aside jury verdict "unless the evidence so preponderates in favor of the party against whom the verdict was rendered that it is clear that the jury did not reach its conclusion on a fair interpretation of the evidence.").

## II. *Molded Verdict Issues*

The most difficult issues on this appeal involve the process by which, under New York law, verdicts are molded into judgments. Guided by a desire to encourage settlement of tort cases and by the corresponding but often incompatible principles that (1) each plaintiff should receive just compensation for his or her injuries and (2) each defendant should pay only its equitable share, New York passed legislation in the 1970s and 1980s to govern verdict molding. *See* L.1972, ch. 830, § 3, amended L.1974, ch. 742, § 3 (codified at N.Y.G.O.L. § 15–108 (McKinney 1989)); L.1974, ch. 742, § 1 (codified at N.Y.C.P.L.R. art. 14 (McKinney 1976)); L.1986, ch. 682, § 6 (codified at N.Y.C.P.L.R. art. 16 (McKinney Supp. 1992)); L.1986, ch. 682, § 9 (codified at N.Y.C.P.L.R. art. 50–B (McKinney Supp. 1992)). Judge Weinstein aptly described the complexities created: "New York's legislative battles yielded a statutory scheme built on compromises resulting in ambiguities, inconsistencies and difficulties in administration. The effect and meaning of many of the provisions remains uncertain." 772 F.Supp. at 1385.

The most significant piece of the verdict molding puzzle, for our purposes, is New York General Obligations Law section 15–108, which governs the effect of settle-

ments on the liability of non-settling joint tortfeasors. That statute provides:

(a) Effect of release of or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipul[a]ted by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

(b) Release of tortfeasor. A release given in good faith by the injured person to one tortfeasor as provided in subdivision (a) relieves him from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules.

(c) Waiver of contribution. A tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person.

N.Y.G.O.L. § 15–108 (McKinney 1989). The statute was passed largely in response to *Dole v. Dow Chem. Co.*, 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972), in which the New York Court of Appeals created a disincentive to settlement by holding that where a plaintiff sues only one of two joint tortfeasors, the defendant may implead the other tortfeasor for an equitable apportionment of liability. *Dole* was extended to mean that a settling defendant could be impleaded by non-settling defendants for any excess amount apportioned to the settling defendant by the jury. *See, e.g., Blass v. Hennessey*, 44 A.D.2d 405, 355 N.Y.S.2d 506 (1974). Section 15–108 ensures that defendants receive the full benefit of settlement and that plaintiffs do not automatically release all tortfeasors by settling with one. *See* N.Y.G.O.L. § 15–108 commentary (McKinney 1989); *Rock v.*

*Reed–Prentice Div. of Package Mach. Co.*, 39 N.Y.2d 34, 40–41, 382 N.Y.S.2d 720, 723, 346 N.E.2d 520, 523 (1976). At the same time, the statute attempts to apportion liability as fairly as possible among non-settling defendants, to minimize under-recovery by plaintiffs or overpayment by defendants.

## A. Classification of Fault Sharers

Pursuant to New York's verdict-molding statutes, much turns on how various parties and non-parties are classified—who is deemed to have settled with whom, who remains in the action as a defendant, and who is listed on the verdict form as a fault sharer.

### 1. *Manville Trust*

▮ We first consider whether the Manville Trust was a settled party for purposes of verdict molding. Defendants argue that they are entitled to a set-off under G.O.L. § 15–108 for what they view as plaintiffs' settlement with the Manville Trust. Judge Weinstein properly determined, however, that the Manville Trust could not be viewed as a settlor.

The Manville Trust arose out of the Johns–Manville Corporation's discharge in bankruptcy. The Trust's financial troubles led to a class action, which ended with a settlement establishing a procedure by which class members could make claims against the Trust and get paid. *In re Joint Eastern & Southern Dist. Asbestos Litig.; In re Johns–Manville Corp.; Findley v. Blinken (Findley)*, 129 B.R. 710 (E. & S.D.N.Y.1991). Under the class settlement, a distribution process was created whereby claimants could negotiate their claims with the Trust within carefully delineated bounds, and receive payments over time. *Id.* at 767–70, 856–57. "As a technical matter, the Trust is removed from tort litigation except under very restricted circumstances. Negotiated settlement of claims is clearly favored under the Settlement." *Id.* at 856.

The present plaintiffs, instead of giving releases and getting paid, renounced their claims against the Manville Trust. The

plaintiffs thus chose, under the *Findley* settlement, *not* to settle with the Trust. Judge Weinstein, who presided over *Findley*, noted that "plaintiffs were correct that the individual claims against the trust had not been settled, although the class action had set a framework for individual settlements." *In re Eastern & Southern Dists. Asbestos Litig.*, No. NYAL 4000, No. TS 90–9999, slip op. at 1, 1991 WL 270626 (E. & S.D.N.Y. Dec. 5, 1991). Although the *Findley* settlement may *resemble* a settlement of plaintiffs' individual claims against the Trust, it does not actually settle those claims. The distinction between a settlement and a structure for settlement is real, and in this case it is dispositive.

The defining moment of settlement, by the clear terms of section 15–108, is when the plaintiff gives a release to the defendant. N.Y.G.O.L. § 15–108(a) (McKinney 1989); *see, e.g., Board of Educ. v. Mars Assocs., Inc.*, 172 A.D.2d 214, 215, 568 N.Y.S.2d 68, 68–69, *motion dismissed*, 78 N.Y.2d 861, 576 N.Y.S.2d 220, 582 N.E.2d 603 (1991); *DiIorio v. Gibson & Cushman, Inc.*, 167 A.D.2d 267, 268, 561 N.Y.S.2d 767, 768 (1990), *appeal dismissed*, 77 N.Y.2d 986, 571 N.Y.S.2d 909, 575 N.E.2d 395, *cert. denied*, —— U.S. ——, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991); *DeSano v. Tower*, 129 A.D.2d 976, 977, 514 N.Y.S.2d 153, 154 (1987). Here, although the *Findley* settlement· established a procedure by which plaintiffs could have settled with the Manville Trust and begun to receive compensation, 129 B.R. at 768–70, plaintiffs never availed themselves of that procedure and never provided the Trust with releases. Therefore, section 15–108 does not entitle defendants to any set-off predicated on the *Findley* class settlement with the Manville Trust. *But see Borucki v. ACANDS, Inc.*, Index No. H–90622 (N.Y.Sup.Ct. Erie Cty. Apr. 10, 1992), slip op. at 4 (holding Manville Trust a settlor under section 15–108).

### 2. *H.K. Porter and Eagle–Picher*

■ The district court concluded, for purposes of section 15–108, that the plaintiffs represented by Levy Phillips & Konigsberg had not settled with H.K. Porter. On the other hand, the court concluded that the plaintiffs represented by Sullivan & Liapakis and by Lipsitz Green Fahringer Roll Salisbury & Cambria had settled with H.K. Porter and Eagle–Picher. Defendants argue that the former ruling was error; plaintiffs contest the latter. We affirm both rulings.

The parties emphasize different aspects of the settlement negotiations between the Levy firm plaintiffs and H.K. Porter prior to H.K. Porter's bankruptcy filing. Defendants emphasize that the district court reviewed a proposed settlement agreement between the parties, told counsel to execute the agreement, and believed the matter settled. Plaintiffs retell the events differently—a retelling supported by the record. The parties struggled to reach a meeting of the minds. With Judge Weinstein's vigorous encouragement, they strove to settle. In the end, however, plaintiffs refused to sign the agreement and refused to provide releases on the terms stated. Because no binding settlement agreement acceptable to both sides was ever reached, and because the plaintiffs never provided the defendants with releases, the court properly treated H.K. Porter as a non-settling bankrupt as to the Levy plaintiffs. Again, the question turns on whether the plaintiffs provided releases. *DeSano*, 129 A.D.2d at 977, 514 N.Y.S.2d at 154.

■ We are therefore unperturbed by the district court's ruling, on the other hand, that the plaintiffs represented by Sullivan & Liapakis and by Lipsitz Green Fahringer Roll Salisbury & Cambria had settled with Eagle–Picher and H.K. Porter. Those parties, unlike the Levy plaintiffs, reached agreement and the plaintiffs gave releases. Defendants subsequently went bankrupt, but insolvency does not render settlements voidable. *See Cirrincione v. Joseph A. Bruno, Inc.*, 143 A.D.2d 722, 723, 533 N.Y.S.2d 290, 291 (1988).

The Sullivan and Lipsitz plaintiffs argue, with twenty-twenty hindsight, that their settlements with Eagle–Picher and H.K. Porter were uncertain and contingent. They urge, citing *McNair v. Owens–Corning Fiberglas Corp.*, 890 F.2d 753 (5th

Cir.1989) (applying Texas settlement set-off statute), that if a settlement is uncertain and contingent, then it cannot support a set-off. *McNair*, however, involved notes whose payment was made contingent upon the outcome of litigation between two defendants and their insurers. *Id.* at 756. Its reasoning does not extend to a binding settlement not subject to any contingencies, even if the certainty of that settlement is shaken by the settling defendant's subsequent insolvency. *See Cirrincione*, 143 A.D.2d at 723, 533 N.Y.S.2d at 291.

### 3. *Flintkote*

The district court dismissed defendant Flintkote for lack of evidence of Flintkote product identification. When the jury allocated a small share of fault to Flintkote, the court granted judgment in favor of Flintkote as a matter of law. The remaining defendants now argue that the dismissal and judgment as a matter of law should be reversed. The significance to defendants, of course, is that Flintkote's removal from the tortfeasor ranks means the reallocation of Flintkote's potential liability to the remaining defendants. *See* 772 F.Supp. at 1405–06 (reallocating Flintkote share among all culpable parties).

We note that a few witnesses testified that they recalled using Flintkote products at BNY. Defendants, however, waived their objection to Flintkote's dismissal by failing to press their objection at the district court level. While defendants raised a preliminary objection to the dismissal, they did not respond to the district court's invitation to submit briefs on the issue, and they did not object to the district court's grant of judgment as a matter of law.

### 4. *United States Navy*

The district court denied plaintiffs' request that the Navy be listed on the verdict form as a nonparty fault sharer, whose share of fault would become subject to post-verdict judgment molding. Plaintiffs point out that the Navy can be allocated a share of fault for its own failure to warn, along with the failure to warn of the defendants. The court could have chosen to include the Navy on the verdict form, *see Kelly v. Long Island Lighting Co.*, 31 N.Y.2d 25, 29, 334 N.Y.S.2d 851, 854, 286 N.E.2d 241, 242–43 (1972) (permitting "apportionment of damages among joint or concurrent tort-feasors regardless of the degree or nature of the concurring fault"), and, for purposes of determining as accurately as possible the proper equitable share of settling defendants, perhaps inclusion would have been the better choice. *See Gannon Personnel Agency, Inc. v. City of New York*, 57 A.D.2d 538, 540, 394 N.Y.S.2d 5, 8 (1977) (holding that trial court erred by failing to include judgment-proof defendant in jury charge as potential fault sharer). But Judge Weinstein's decision— that the asbestos-product manufacturers' failure to warn is best understood as a separate matter from the Navy's failure— was not unreasonable. As discussed earlier, we consider it appropriate to give the trial judge a certain amount of leeway in managing a complex trial, and we therefore affirm the district court's decision not to include the Navy on the verdict form. *Cf. T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1535 (11th Cir.) (district court's decision whether to order separate trials under Federal Rule of Civil Procedure 42 reviewable only for abuse of discretion), *modified*, 769 F.2d 1485 (11th Cir.1985); *Garber v. Randell*, 477 F.2d 711, 714 (2d Cir.1973) (same).

### B. Reallocation of Fault of Bankrupts and Nonparties

Some tortfeasors to whom the jury attributed shares of responsibility remained out of plaintiffs' reach for recovery of damages. These untouchable tortfeasors fall into two groups: bankrupts, who are protected from judgment by the automatic stay of 11 U.S.C. § 362(a) (1988); and nonparties, such as nondiverse tortfeasors, who would be defendants but for their jurisdictional unobtainability. The district court gave the parties "wide latitude to introduce evidence to establish who substantially contributed to the alleged injuries," allowing the defendants "to argue that the damages were caused at least in part, if not entirely, by other manufactur-

ers not present at trial." 772 F.Supp. at 1399. The court then included on the verdict sheets all possible asbestos-supplying tortfeasors, in keeping with the evidence introduced and with New York practice. *See Kelly v. Long Island Lighting Co.*, 31 N.Y.2d 25, 29, 334 N.Y.S.2d 851, 854, 286 N.E.2d 241, 242–43 (1972); *In re New York City Asbestos Litigation*, 151 Misc.2d 1, 572 N.Y.S.2d 1006 (Sup.Ct.1991).

After the jury attributed shares of fault to various bankrupts and nonparties, the district court—in all cases brought under the revival provision of the New York Toxic Tort Reform Act of 1986, L.1986, ch. 682, § 4, *reprinted after* N.Y.C.P.L.R. § 214–c (McKinney 1990)—reallocated those shares to the non-settling defendants, ensuring that plaintiffs would not suffer undercompensation by virtue of the unobtainability of recovery from certain tortfeasors. The court explained: "The language and structure of New York's statutory scheme is persuasive that the New York Court of Appeals would hold non-settling defendants jointly and severally liable for uncollectible shares pursuant to section 15–108." 772 F.Supp. at 1400. Defendants take issue with the court's handling of the shares attributed to bankrupts and nonparties, contending that those shares should have been spread among all culpable parties, rather than reallocated to the non-settling defendants alone.

General Obligations Law section 15–108 allows a reduction in plaintiffs' verdicts for the equitable share of settlors' fault or the amount received in settlement; it does not by its terms allow further reductions for the fault of bankrupts and non-parties. The General Obligations Law thus does not provide any basis for defendants to avoid New York's traditional rule of joint and several liability, which was preserved for actions revived pursuant to the 1986 revival statute. *See* L.1986, ch. 682, § 12, *reprinted after* N.Y.C.P.L.R. § 1600 (McKinney Supp.1992) (exempting revived actions from C.P.L.R. § 1601's limitation on joint and several liability).

Holding non-settling defendants jointly and severally liable for the share of responsibility attributed to bankrupts and nonparties works some unfairness to the defendants who are thus held accountable for more than their fair share of fault. The policy of affording plaintiffs full compensation does not always mesh neatly with the policy of protecting defendants from paying more than their equitable share. In weighing these competing interests, we look to New York law, which, as noted above, does not provide any basis for deviating in this situation from the traditional rule of joint and several liability.

We therefore affirm the district court's reallocation of bankrupts' and nonparties' shares to the non-settling defendants. We note that other courts have reached the same result. *Hoerr v. Northfield Foundry & Mach. Co.*, 376 N.W.2d 323, 332–34 (N.D.1985); *Chart v. General Motors Corp.*, 80 Wis.2d 91, 108–09, 258 N.W.2d 680, 687–88 (1977). *But see In re New York City Asbestos Litigation*, 151 Misc.2d at 10, 572 N.Y.S.2d at 1010 (holding in state BNY asbestos trial that the liability of bankrupt defendants should be reallocated to both settling and non-settling defendants).

This does not necessarily mean that the non-settling defendants will bear the entire brunt of the reallocation. Under article 14 of the C.P.L.R., non-settling defendants who pay more than their equitable share retain the right to pursue reimbursement from bankrupt or absent joint tortfeasors. N.Y.C.P.L.R. §§ 1401–1403 (McKinney 1976); *see Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 284 (2d Cir.), *cert. dismissed*, — U.S. —, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990).

**C. Bankrupts Under C.P.L.R. § 1601**

The district court held that bankrupt tortfeasors are parties over whom the plaintiffs could not have exercised jurisdiction for purposes of equitable share allocation under section 1601 of the C.P.L.R.[2] 772 F.Supp. at 1404–05. The court explained:

2. Section 1601 provides:

 1. Notwithstanding any other provision of

law, when a verdict or decision in an action

As a technical matter entities which have filed petitions for bankruptcy are subject to suit, but the automatic stay precludes processing a claim against them. 11 U.S.C. § 362(a) (1988). No amount of diligence could result in the plaintiff bringing bankrupt parties into this litigation; hence it does not appear that their share should be considered pursuant to Article 16.

772 F.Supp. at 1404. We agree. Because plaintiffs could not with due diligence obtain effective jurisdiction over the bankrupt parties, the shares of fault attributed to those parties were properly excluded from the Article 16 calculation. *See Zakshevsky v. City of New York,* 149 Misc.2d 52, 54, 562 N.Y.S.2d 371, 372 (Sup.Ct.1990) (holding that because plaintiff could have obtained jurisdiction over defendant, jury must be allowed to determine that defendant's share of fault).

### D. Interplay Between G.O.L. § 15–108 and C.P.L.R. § 1601

In those cases to which the tort reform provisions of C.P.L.R. article 16 apply, we face a novel question: How exactly should the G.O.L. § 15–108 and C.P.L.R. § 1601 calculations proceed in cases where both statutes apply? Section 15–108 provides a set-off for settlements by joint tortfeasors. Section 1601 limits liability for non-economic damages to each defendant's equitable

*Plaintiffs' method*

```
 75,000 non-economic damages
– 39,000 settlement credit

 36,000
[ ÷ 3] divided by 3 for Article 16 share
```

share.[3] The order and method of these calculations profoundly affects the liability of each defendant and the total recovery by the plaintiffs.

The litigants propose wildly different methods for calculating set-offs in Article 16 cases. Plaintiffs suggest that a defendant not be given the benefit of both section 15–108 and section 1601, but instead be allowed only the greater of the two reductions. Defendants, on the other hand, would apply the two calculations seriatim, thus compounding the statutes' effect in reducing defendants' liability. As will be explained in some detail, we conclude that, contrary to the arguments of both plaintiffs and defendants, section 15–108 and section 1601 carry independent effects on liability; the effect of one section neither removes nor redoubles the effect of the other.

The district court offered the following hypothetical case to illustrate the proposed methods of calculation:

A plaintiff sues three defendants, A, B and C and obtains a verdict of $100,000, $25,000 of which is allocated to economic damages and $75,000 of which compensates for non-economic damages. The jury apportions fault equally at 33.3% each. Prior to trial defendant A settled with the plaintiff for $39,000.

---

or claim for personal injury is determined in favor of a claimant in an action involving two or more tortfeasors jointly liable ... and the liability of a defendant is found to be fifty percent or less of the total liability assigned to all persons liable, the liability of such defendant to the claimant for non-economic loss shall not exceed that defendant's equitable share determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss; provided, however that the culpable conduct of any person not a party to the action shall not be considered in determining any equitable share herein if the claimant proves that with due diligence he was unable

to obtain jurisdiction over such person in said action....

2. Nothing in this section shall be construed to affect or impair any right of a tortfeasor under section 15–108 of the general obligations law.

N.Y.C.P.L.R. § 1601 (McKinney Supp.1992).

3. Section 1601's limitation on joint and several liability applies only to defendants to whom the jury attributed fifty percent or less of the total fault. N.Y.C.P.L.R. § 1601(1) (McKinney Supp. 1992). That caveat plays no role in the present litigation, however, inasmuch as the jury allocated less than fifty percent of the fault to each of the BNY tortfeasors.

```
 12,000 each non-settlor['s] share
+ 12,500 half of economic damages (joint & several liability of B & C)

 24,500 TOTAL owed by each non-settling defendant
```

*Defendants' method*

```
 100,000 total verdict
- 39,000 settlement credit

 61,000 must calculate portion for unpaid economic damages

× 25%

 15,250 unpaid economic damages
 [÷ 2] divide by 2 for each non-settlor's share

 7,625 each non-settlor's share of economic damages
 45,750 remaining unpaid non[-]economic damages
 [÷ 3] divided by three (Art. 16)

 15,250 non-settlor's share of non-economic damages
+ 7,625 non-settlor's share of economic damages

 22,875 TOTAL owed by each non-settling defendant
```

772 F.Supp. at 1411–12. Viewing the debate in these terms, the district court opted for defendants' method, finding that it would "better effectuate the statutory scheme." *Id.* at 1412. The court focused on the language of subsection 1601(2), which states: "Nothing in this section shall be construed to affect or impair any right of a tortfeasor under section 15–108 of the general obligations law." N.Y.C.P.L.R. § 1601(2) (McKinney Supp.1992). The court explained that "General Obligations Law deductions should be calculated first and subtracted from the total verdict, as requested by the defendants, since Article 16 specifically states that it is not meant in any way to limit the application of section 15–108." 772 F.Supp. at 1412.

Plaintiffs argue that the district court misconstrued their proposed method of calculation. Plaintiffs, in fact, propose that defendants be given *either* the 15–108 set-off *or* the 1601 set-off, whichever is greater. Thus, using the hypothetical scenario above, plaintiffs would proceed as follows:

```
 100,000 total verdict
× 33.3% A's share of fault

 33,333 A's equitable share of damages
 39,000 settlement amount

 39,000 set-off under section 15–108 (greater of two amounts above)
 75,000 non-economic damages
× 33.3% A's share of fault

 25,000 set-off under section 1601 (A's share of non-economic damages)

 39,000 total set-off (greater of 15–108 set-off and 1601 set-off)
```

Non-settling defendants A and B, under this calculation method, would be given the section 15–108 set-off of $39,000, because that amount is greater than the $25,000 by which the non-settling defendants' liability would be reduced if only section 1601 applied. Plaintiffs argue that as long as the greater of the two amounts is applied, tortfeasors' rights under both section 15–108 and section 1601 remain unimpaired.

We find that the correct answer is none of the above. The approach labelled "Plaintiffs' method" by the district court does not make sense, because the section 15–108 set-off is deducted from the amount of non-economic damages only, rather than from the entire award. This results—surprisingly given that the district court believed this was plaintiffs' proposal—in an unfairly low cap on each defendant's liability for non-economic damages. As section 15–108 does not distinguish between economic and non-economic damages, *see* N.Y.G.O.L. § 15–108 (McKinney 1989), and no party has suggested that settlements account only for non-economic damages, we see no basis for subtracting the 15–108 set-off from the non-economic damages award rather than from the total verdict.

The method employed by the district court and supported by defendants fares no better under scrutiny. The court, instead of calculating the section 1601 cap on each defendant's liability from the total amount of non-economic damages, calculated the cap from the amount of non-economic damages remaining unpaid after the section 15–108 set-off. This method, like the previous one but still more emphatically, improperly reduces the amount of non-economic damages for which each defendant can be held liable. Successive application of section 15–108 and section 1601 gives defendants an unwarranted double benefit from the settlement set-off. First, it gives defendants the full benefit of the settlement set-off under section 15–108, by subtracting the amount of the settlement (or, if greater, the settlor's equitable share of liability) from the total verdict. Then, it gives defendants an added benefit by calculating the section 1601 liability cap from the reduced verdict. Nothing in section 1601 suggests that that section should be applied *after* calculation of the section 15–108 set-off, as the district court did and as defendants argue we should affirm.

While we are persuaded by plaintiffs' critique of defendants' method, we are not persuaded that plaintiffs' own proposal is correct. Plaintiffs' method—by which a defendant is given either the 15–108 set-off or the 1601 set-off, whichever is greater—does not comport with the plain meaning of section 1601. This approach ignores the independent significance that each of the two statutes retains notwithstanding the application of the other. Under plaintiffs' method, crediting defendants with a section 15–108 set-off takes section 1601 entirely out of the picture. This approach is fundamentally flawed. Section 1601 should not be understood as providing for a "set-off" against total liability. Section 1601 does not necessarily reduce total liability; rather, it caps a particular defendant's liability for non-economic damages at that defendant's equitable share of those damages. Even if a defendant receives the benefit of a settlement set-off under section 15–108, section 1601 protects that defendant from being held liable for more than its share of non-economic damages.

This analysis of each proposal's shortcomings suggests the correct approach. The calculations pursuant to each statute should proceed unaffected by the other statute, as follows: (1) Ascertain the section 1601 liability cap. If the jury apportioned fifty percent or less of fault to a defendant, section 1601 mandates that "the liability of such defendant to the claimant for non-economic loss shall not exceed that defendant's equitable share." N.Y.C.P.L.R. § 1601(1) (McKinney Supp. 1992). Thus, multiply the total amount of non-economic damages by the defendant's share of fault. The defendant's liability for non-economic damages may not exceed the resulting figure. (2) To calculate the section 15–108 set-off, first multiply the total verdict by the settling defendant's share of fault.[4] If the result is greater than the settlement amount, then that figure is the amount of the set-off; if the settlement amount is greater, then the set-

**4.** Our discussion here of the proper method of calculating the set-off under section 15–108 should not be taken as expressing a view on whether that set-off should be calculated in the aggregate or settlement-by-settlement, which issue we remand to the district court for the reasons stated in section II(E), *infra*.

off equals the settlement amount.[5] (3) Subtract the 15–108 set-off from the total verdict, to determine the amount of liability remaining. (4) Multiply the amount of liability remaining after the set-off by the percent of the total verdict that the jury deemed economic damages. For example, if the jury awarded $75,000 non-economic damages and $25,000 economic damages, the liability remaining would be multiplied by 25 percent. The resulting figure is the amount of economic damages remaining after the settlement set-off. Non-settling defendants are jointly and severally liable for this amount. (5) Multiply the amount of total liability remaining after the set-off by the percent of the total verdict that the jury deemed non-economic damages. The resulting figure is the amount of non-economic damages for which the non-settling defendants may potentially be held liable. Each defendant's liability for non-economic damages, however, is limited by section 1601 as calculated in step 1 above.

Thus, section 15–108 and section 1601 work independently, but not successively. Each section's calculation proceeds from the original verdict, and each section's impact—the 15–108 set-off and the 1601 cap—retains its significance notwithstanding the application of the other section.

To illustrate, again using Judge Weinstein's hypothetical case, the calculations should run as follows:

I. *Section 1601*

| | |
|---|---|
| 75,000 | non-economic damages |
| × 33.3% | B's share of fault; C's share of fault |
| 25,000 | maximum liability of B or C for non-economic damages |

II. *Section 15–108*

| | |
|---|---|
| 100,000 | total verdict |
| × 33.3% | A's share of fault |
| 33,333 | A's equitable share of damages |
| 39,000 | settlement amount |
| 39,000 | set-off under section 15–108 (greater of two amounts above) |
| 100,000 | total verdict |
| − 39,000 | set-off under section 15–108 |
| 61,000 | liability remaining after 15–108 set-off |
| × 25% | proportion of economic damages |
| 15,250 | amount of economic damages for which B and C are jointly and severally liable |
| 61,000 | liability remaining after 15–108 set-off |
| × 75% | proportion of non-economic damages |
| 45,750 | total amount of non-economic damages for which B and C are liable (but neither B nor C, under section 1601, may be held liable for more than 25,000 of this amount) |

Based on these calculations, plaintiff is entitled to recover $15,250 in economic damages from B and/or C, who are jointly and severally liable for that amount. Plaintiff is further entitled to recover $45,750 in non-economic damages from B and C, but may not recover more than $25,000 of that amount from either B or C. Plaintiff therefore may recover the entire $100,000 verdict [6]—assuming sufficient solvency—

---

5. The parties to a settlement may also stipulate to a set-off amount higher than either the settlement amount or the settling defendant's equitable share of damages. *See* N.Y.G.O.L. § 15–108(a) (McKinney 1989).

6. This calculation method will not always yield judgments for the full amount of the verdict. For example, if our hypothetical plaintiff had settled with defendant A for $30,000 instead of $39,000, B and C would be jointly and severally liable for $16,666 in economic damages, and B and C would each be liable for $25,000 in non-

but neither B nor C may be held liable to plaintiff for more than $40,250 total economic and non-economic damages. This approach gives section 15–108 full effect: plaintiff's verdict against the non-settling tortfeasors is reduced by $39,000, the amount of consideration paid for settlement. At the same time, it fully exercises section 1601: plaintiff's recovery against B and against C for non-economic damages is capped at $25,000, each defendant's equitable share of those damages.

### E. Aggregation of Set–Offs

When a plaintiff obtains a verdict against a defendant, and another defendant has settled, section 15–108 requires a judge to deduct from the verdict either the amount of the settlement or the percentage of fault allocated to the settlor, whichever is greater. In the usual tort case, this may be a fairly simple calculation. The matter is vastly more complicated where, as here, there are numerous settlors, and some of the settlements turn out to exceed the dollar value of the fault percentage allocated by the jury, while other settlements prove to be less than the percentage allocation of fault. In such a case, a court faced with the question of which is greater, the dollar amount of the settlement or the dollar value of the percentage of fault, must decide whether to make that determination on a settlement-by-settlement basis or on an aggregated basis. This decision may significantly affect the total amount of set-off.

The district court, upon careful consideration of this issue, concluded that the aggregation approach comports with the goals of the statute: "There is no justification for rewarding recalcitrant non-settling defendants by permitting them to apply the General Obligations Law offset in a manner that reduces or even obliterates their own liability in cases where plaintiffs are not fully compensated for their injuries." 772 F.Supp. at 1393. Calculating set-offs on a settlement-by-settlement basis, the court reasoned, tends to shortchange plain-

tiffs and give windfalls to non-settling defendants. Nevertheless, the district court felt constrained by several New York Supreme Court cases holding that set-offs should be figured one by one, and therefore declined to compute the set-offs on an aggregated basis. *Id.* at 1394–97 (citing *Killeen v. Reinhardt*, 71 A.D.2d 851, 419 N.Y.S.2d 175 (1979); *In re New York City Asbestos Litigation*, 151 Misc.2d 1, 572 N.Y.S.2d 1006 (Sup.Ct.1991); *Williams v. Niske*, 147 Misc.2d 556, 557 N.Y.S.2d 1006 (Sup.Ct.1989)).

 A federal court faced with a question of unsettled state law must do its best to guess how the state court of last resort would decide the issue. *See DeWeerth v. Baldinger*, 836 F.2d 103, 108 (2d Cir.1987), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988); *Cooper v. American Airlines, Inc.*, 149 F.2d 355, 359 (2d Cir.1945). Where the high court has not spoken, the best indicators of how it would decide are often the decisions of lower state courts. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967). As the district court explained, "[w]hile a federal court is not bound by lower state court decisions, they do have great weight in informing the court's prediction on how the highest court of the state would resolve the question." 772 F.Supp. at 1390. Therefore, notwithstanding the district court's conviction that aggregation is the sounder approach, it followed the state courts' interpretation of section 15–108 to the contrary as uttered in *In re New York City Asbestos Litigation*, 151 Misc.2d at 10, 572 N.Y.S.2d at 1009, and *Williams v. Niske*, 147 Misc.2d at 559, 557 N.Y.S.2d at 1009.

We understand that the Supreme Court of New York, Appellate Division, First Department, is faced with the aggregation issue in a pending appeal that was argued on March 17, 1992. *Didner v. Keene Corp.*, Appeal No. 45690, Index No. 27373/89 (N.Y.App.Div., 1st Dep't). The First Department's decision will likely be

---

economic damages. Thus, the plaintiff would recover, at most, $96,666 of the $100,000 award. Likewise, the plaintiff's recovery would be less than full if some share of fault were apportioned to a non-party tortfeasor.

the first guidance on the issue from a New York appellate court.[7] Because of the absence of appellate authority on this question, and because of the apparent conflict between the decisions of the state trial courts and the logic underlying the statute, we think it appropriate for federal resolution of this issue to await the Appellate Division's decision in the pending case. We therefore remand the matter to the district court for reconsideration in light of the First Department's anticipated decision in *Didner v. Keene Corporation.*

### F. Prejudgment Interest

New York Estates, Powers and Trusts Law provides for prejudgment interest on wrongful death damages:

> Interest upon the principal sum recovered by the plaintiff from the date of the decedent's death shall be added to and be a part of the total sum awarded.

N.Y.E.P.T.L. § 5–4.3(a) (McKinney Supp. 1992). Defendants take issue with three of the district court's rulings applying this provision.

#### 1. *On Pre–Death Loss of Income*

■■ The court allowed prejudgment interest on all the awards for past loss of income. This decision, no doubt, derived from the sound reasoning that a past pecuniary loss, if not computed at present value, is not fully compensated unless accompanied by interest.

Nevertheless, the court's ruling was incorrect under New York law. "The right to interest is purely statutory and in derogation of the common law and it cannot be extended beyond the statutory regulations or limitations." *Gordon v. Board of Educ.,* 52 Misc.2d 175, 176, 274 N.Y.S.2d 543, 545 (Sup.Ct.1966). The district court's ruling ignored the statutory distinction between wrongful death and survival actions. New York law provides explicitly for prejudgment interest on wrongful death damages. N.Y.E.P.T.L. § 5–4.3(a) (McKinney Supp.1992). The statute concerning surviv-

al action damages, by contrast, makes no mention of prejudgment interest. *See* N.Y.E.P.T.L. § 11–3.3 (McKinney 1967). The distinction between wrongful death and survival actions for purposes of prejudgment interest makes sense only if one views wrongful death damages as essentially pecuniary and survival damages as essentially non-pecuniary, *see, e.g., Slater v. State,* 192 Misc. 826, 829, 82 N.Y.S.2d 313, 316–17 (Ct.Cl.1948) (refusing to allow prejudgment interest on damage award for decedent's pain and suffering), *appeal dismissed,* 276 A.D. 824, 93 N.Y.S.2d 712 (1949), but the statutes do not so characterize the distinction.

Damages for past loss of income suffered by a decedent prior to death must be considered survival action damages, and therefore are not susceptible to an award of prejudgment interest. By statutory definition, wrongful death damages include only "pecuniary injuries resulting from the decedent's death." N.Y.E.P.T.L. § 5–4.3(a) (McKinney Supp.1992). Pre-death loss of income cannot be said to result from the decedent's death, and thus is properly viewed as survival action damages.

■■ A survival action, after all, is essentially a decedent's personal injury lawsuit. *See* N.Y.E.P.T.L. § 11–3.3 (McKinney 1967). Prejudgment interest is not allowed in such actions. *Gillespie v. Great Atl. & Pac. Tea Co.,* 44 Misc.2d 670, 671, 255 N.Y.S.2d 10, 11 (Sup.Ct.1964) ("It has long been the established rule that in all personal injury actions ..., the plaintiff has not been entitled in any circumstance to recover interest on the damages assessed."), *aff'd,* 26 A.D.2d 953, 276 N.Y.S.2d 372 (1966), *modified on other grounds,* 21 N.Y.2d 823, 288 N.Y.S.2d 907, 235 N.E.2d 911 (1968).

■■ One might argue that another New York interest provision supports the district court's award. By statute, New York provides for interest "upon a sum awarded ... because of an act or omission depriving or otherwise interfering with title to, or

---

7. The Appellate Division used a defendant-by-defendant approach to calculate set-offs in *Killeen,* 71 A.D.2d at 853, 419 N.Y.S.2d at 178; *id.* at 853–54, 419 N.Y.S.2d at 178 (Suozzi, J., concurring), but did not discuss the issue.

possession or enjoyment of, property." N.Y.C.P.L.R. § 5001(a) (McKinney 1963); see Delulio v. 320–57 Corp., 99 A.D.2d 253, 254, 472 N.Y.S.2d 379, 381 (1984). Interference with "property" under section 5001(a), however, does not include loss of income. Gordon, 52 Misc.2d at 177, 274 N.Y.S.2d at 546 ("When this section talks of 'property,' it obviously does not refer to a salary situation.").

We therefore reverse the district court's award of prejudgment interest on survival action damages for loss of income.

### 2. On Postjudgment Losses

■ Prejudgment interest on postjudgment losses, an award fit for Alice in Wonderland, was in fact awarded to plaintiffs in district court. At that time, we had already twice held that prejudgment interest should not be added to future damages under N.Y.E.P.T.L. § 5–4.3(a). Woodling v. Garrett Corp., 813 F.2d 543, 559–60 (2d Cir.1987); Shu–Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 52 (2d Cir. 1984). Those decisions were based on the logic that a jury only discounts future losses back to the date of its verdict, and that interest is therefore unnecessary to ensure full compensation. It makes no sense, we reasoned, to award prejudgment interest on losses that have not yet been incurred.

The district court disregarded Woodling and Shu–Tao Lin because several New York state court decisions persuaded it that the New York Court of Appeals would allow the interest. See, e.g., Soulier v. Hughes, 119 A.D.2d 951, 954, 501 N.Y.S.2d 480, 482–83 (1986). Judge Weinstein explained:

> It does, as the Second Circuit suggests, appear counterintuitive to award interest on damages yet to occur. At the same time, the statutory scheme taken as a whole limits plaintiffs' recovery in some ways and allows added compensation in other respects. In such statutory compromises some irrationality is to be expected in order to achieve legislative consensus.

772 F.Supp. at 1409–10.

Since Judge Weinstein rendered his decision, the New York Court of Appeals has resolved the issue. On January 14, 1992, in Milbrandt v. A.P. Green Refractories Co., 79 N.Y.2d 26, 35, 580 N.Y.S.2d 147, 151, 588 N.E.2d 45, 49 (1992), the Court of Appeals held that "the statutory purpose of EPTL 5–4.3 prohibits the addition of pre-verdict interest on post-verdict damages not discounted to the date of death." Therefore, as plaintiffs now concede, the district court's rationale no longer holds, and the award of prejudgment interest on postjudgment losses is reversed.

### 3. On Amount of Set–Offs

■ The district court computed prejudgment interest under E.P.T.L. § 5–4.3(a) prior to subtracting the set-off amounts under G.O.L. § 15–108. Defendants contend that the court should have calculated interest only on the amount remaining after set-offs. We disagree. As the New York Court of Appeals stressed in Milbrandt, the prejudgment interest provision is meant to ensure just compensation for the decedent's distributees. 79 N.Y.2d at 35, 580 N.Y.S.2d at 151, 588 N.E.2d at 48–49. Therefore, interest must be added to the award before settlements are taken into account. Section 5–4.3(a)'s language requires as much, stating that prejudgment interest from the date of death "shall be added to and be a part of the total sum awarded." N.Y.E.P.T.L. § 5–4.3(a) (McKinney Supp.1992).

## III. Individual Appeals

### A. Feldman

■ Plaintiff Goldie Feldman appeals from a judgment in favor of defendants and the denial of her motion for a new trial. The jury found that the disease and death of Feldman's husband were not related to asbestos exposure.

Hyman Feldman worked as a pipe fitter at BNY from 1942 until 1945 or 1946. The medical evidence regarding Mr. Feldman, while suggesting that he may have died from asbestos-related mesothelioma, does not rule out a finding that he died from adenocarcinoma caused by his thirty to

thirty-five years of pack-a-day cigarette smoking. The evidence of the asbestos-relatedness of Mr. Feldman's death—particularly given the brevity of his asbestos exposure and the endurance of his smoking habit—is not so overwhelming as to warrant setting aside the jury verdict.

When a jury's determination is based on an interpretation of facts within their sphere, New York law does not permit a reviewing court to set aside the verdict unless the evidence so preponderates in favor of the party against whom the verdict was rendered that it is clear that the jury did not reach its conclusion on a fair interpretation of the evidence, or if a contrary conclusion is the only reasonable inference that can be made from the proven facts. The federal standard in this circuit is virtually identical.

*Billiar v. Minnesota Mining & Mfg. Co.,* 623 F.2d 240, 247–48 (2d Cir.1980) (citations omitted).

In affirming the judgment against Feldman, we are mindful of the dangers of a streamlined trial process in which testimony must be curtailed and jurors must assimilate vast amounts of information. The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's—and defendant's—cause not be lost in the shadow of a towering mass litigation. *See generally* Peterson & Selvin, *supra,* Law & Contemp.Probs., Summer 1991, at 228 (Mass tort cases "have produced results that sometimes seem capricious" and resulted in "differential treatment of plaintiffs with similar injuries"); Judith Resnik, *From "Cases" to "Litigation",* Law & Contemp.Probs., Summer 1991, at 5 (tracing the growth of aggregate mass tort litigation and the weakening link between individuals and lawsuits).

Every indication, however, is that the jury in this asbestos litigation considered each claim with utmost care and individualized attention. The jurors spent four weeks deliberating. They asked for the full file on each case, and gave each case hours or days of attention. Judge Wein-stein called it "one of the best juries I've ever had," and noted the "remarkable" consistency in its work. Transcript of Motions, *In re New York City Asbestos Litigation,* No. TS 90–9999 (E.D.N.Y. May 7, 1991), at 12–13. We conclude that while the evidence would have supported a verdict in favor of Feldman, it also supported a reasonable inference that Mr. Feldman's death was caused by cigarettes rather than asbestos, and it was the jury's prerogative to make that inference.

### B. Barone

■ Roberta and Perrell Barone appeal from a damage award of $25,000 for their decedent's pain and suffering prior to death. Anthony Barone—Roberta's husband and Perrell's father—died of asbestos-related adenocarcinoma in 1959, at the age of 41, after a year of bodily deterioration. Mr. Barone's widow and daughter testified about the intense pain he endured and his humiliating loss of bladder and bowel control. Plaintiffs contend that, based on the evidence of Mr. Barone's condition, and viewed in comparison to awards in similar cases, the $25,000 award for pain and suffering was so low as to shock the conscience. *See Korek v. United States,* 734 F.2d 923, 929 (2d Cir.1984).

Pinning dollar amounts to suffering is inherently subjective, and peculiarly within the province of the jury. *See Zimmerman v. New York City Health & Hosps. Corp.,* 91 A.D.2d 290, 294–95, 458 N.Y.S.2d 552, 555–56 (1983); *see also Gibbs v. United States,* 599 F.2d 36, 39 (2d Cir.1979) ("measuring pain and suffering in dollars is inescapably subjective"). Nevertheless, we will reject a damage award if it is "so grossly and palpably inadequate as to shock the court's conscience." *Korek,* 734 F.2d at 929. *See generally* David Leebron, *Final Moments: Damages for Pain and Suffering Prior to Death,* 64 N.Y.U.L.Rev. 256, 323 (1989) (advocating increased judicial supervision of jury damage awards for pain and suffering prior to death). Given the record here, replete with undisputed testimony of lengthy and intense suffering, we find that the award shocks the con-

science and therefore remand the Barone case for a new trial confined to the issue of pain and suffering.

Accordingly, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

## APPENDIX

| Cal # | Docket # | Cal # | Docket # | Cal # | Docket # |
|---|---|---|---|---|---|
| 1198 | 91–9329 | 1230 | 91–9389 | 1448 | 92–7031 |
| 1199 | 91–9331 | 1231 | 91–9395 | 1449 | 92–7033 |
| 1200 | 91–9333 | 1232 | 91–9397 | 1450 | 92–7035 |
| 1201 | 91–9335 | 1233 | 91–9399 | 1451 | 92–7037 |
| 1202 | 91–9337 | 1234 | 91–9401 | 1452 | 92–7039 |
| 1203 | 91–9339 | 1235 | 91–9403 | 1453 | 92–7041 |
| 1204 | 91–9341 | 1236 | 91–9405 | 1454 | 92–7043 |
| 1205 | 91–9343 | 1237 | 91–9407 | 1455 | 92–7045 |
| 1206 | 91–9345 | 1238 | 91–9411 | 1456 | 92–7047 |
| 1207 | 91–9347 | 1239 | 91–9413 | 1457 | 92–7049 |
| 1208 | 91–9349 | 1240 | 91–9423 | 1458 | 92–7051 |
| 1209 | 91–9351 | 1241 | 91–9425 | 1459 | 92–7053 |
| 1210 | 91–9355 | 1242 | 91–9427 | 1460 | 92–7055 |
| 1211 | 91–9357 | 1243 | 91–9429 | 1461 | 92–7057 |
| 1212 | 91–9359 | 1244 | 91–9431 | 1462 | 92–7059 |
| 1213 | 91–9363 | 1245 | 91–9433 | 1463 | 92–7063 |
| 1214 | 91–9365 | 1246 | 91–9435 | 1464 | 92–7075 |
| 1215 | 91–9367 | 1247 | 91–9437 | 1465 | 92–7065 |
| 1216 | 91–9369 | 1248 | 91–9439 | 1466 | 92–7067 |
| 1217 | 91–9371 | 1434 | 92–7003 | 1467 | 92–7069 |
| 1218 | 91–9361 | 1436 | 92–7007 | 1468 | 92–7071 |
| 1219 | 91–9373 | 1437 | 92–7009 | 1469 | 92–7073 |
| 1220 | 91–9375 | 1438 | 92–7011 | 1470 | 92–7077 |
| 1221 | 91–9377 | 1439 | 92–7013 | 1471 | 92–7079 |
| 1222 | 91–9379 | 1440 | 92–7015 | 1472 | 92–7081 |
| 1223 | 91–9381 | 1441 | 92–7017 | 1473 | 92–7083 |
| 1224 | 91–9383 | 1442 | 92–7019 | 1474 | 92–7093 |
| 1225 | 91–9385 | 1443 | 92–7021 | 1352 | 92–7157 |
| 1226 | 91–9387 | 1444 | 92–7023 | | 91–9419 |
| 1227 | 91–9441 | 1445 | 92–7025 | | 91–9415 |
| 1228 | 91–9391 | 1446 | 92–7027 | | |
| 1229 | 91–9393 | 1447 | 92–7029 | | |