■ JOHN J. KILLEEN, as Administrator of the Estate of CATHERINE E. KILLEEN, Deceased, Respondent-Appellant, v HENRY G. REINHARDT et al., Defendants, and COMMUNITY HOSPITAL AT GLEN COVE, Appellant-Respondent.—In a medical malpractice action (1) defendant hospital appeals from a judgment of the Supreme Court, Kings County, entered June 7, 1977, upon a jury verdict in favor of plaintiff; and (2) plaintiff and defendant hospital cross-appeal from a resettled judgment of the same court, entered September 7, 1978, which reduced the award in favor of plaintiff and against said defendant from the principal sum of $325,000 to the principal sum of $275,000. Appeal from judgment entered June 7, 1977 dismissed as academic. That judgment was superseded by the resettled judgment entered September 7, 1978. Resettled judgment reversed, on the law, and new trial granted, with costs to abide the event. In this action based upon alleged medical malpractice plaintiff seeks damages for the wrongful death and conscious pain and suffering of Catherine Killeen, the 39-year-old housewife and mother of six. In late November, 1971, Mrs. Killeen, who was then about six months pregnant with twins, suffered an attack of asthma. Her obstetrician, Dr. Henry Reinhardt, prescribed some medication. Despite such medication, however, Mrs. Killeen's condition worsened and, on December 2, 1971, she visited Dr. James Nichlas, an associate of Dr. Reinhardt, complaining of breathing difficulties, coughing and vomiting. Pursuant to Dr.

Nichlas' instructions Mrs. Killeen was admitted that same day to defendant hospital and was seen by Dr. Sanesi, an attending physician apparently specializing in internal medicine. On December 3 Mrs. Killeen was more comfortable and the day passed uneventfully. However, her condition suddenly deteriorated in the early morning hours of December 4, causing her demise within 24 hours. The immediate cause of death was bronchial pneumonia. Plaintiff brought suit against Doctors Reinhardt and Nichlas, Dr. Raphael Muojo, an attending general practitioner who covered for Dr. Sanesi in the latter's absence on December 4, and defendant hospital. At a pretrial conference plaintiff settled with Doctors Reinhardt and Nichlas for the sum of $265,000 and discontinued the action against Dr. Muojo, receiving no monetary consideration for the discontinuance. The trial proceeded against defendant hospital, resulting in an initial general verdict against the hospital in the principal sum of $650,000. Thereafter the jury was instructed on apportionment, whereupon it found Doctors Reinhardt and Nichlas liable for 30% of the damages, Dr. Muojo for 20% and defendant hospital for the remainder. On June 7, 1977 plaintiff entered judgment against defendant hospital in the principal sum of $325,000, seemingly premised on the theory that, under the jury verdict, the hospital was responsible for 50% of the damages. Thereafter, the parties cross-moved to resettle the judgment. Both sides agreed that the verdict against the hospital had to be reduced by the Reinhardt-Nichlas settlement, pursuant to subdivision (a) of section 15-108 of the General Obligations Law, thus leaving outstanding the sum of $385,000. However, the hospital claimed that it was entitled to an additional reduction in the amount of $130,000, being Dr. Muojo's equitable share of the damages as found by the jury and calculated by taking 20% of the original verdict. The trial court agreed that the verdict had to be reduced by Dr. Muojo's equitable share of the damages but calculated such share at $110,000 by giving effect to the jury's verdict that the hospital's degree of fault (50%) was two and one-half times greater than Dr. Muojo's (20%). The result was the entry of a resettled judgment against the hospital in the principal amount of $275,000. We reverse. The case went to the jury, as against the hospital, on six theories of medical malpractice. First, plaintiff claimed that the hospital, through one of its medical residents, had failed to take a proper history upon Mrs. Killeen's admission, specifically failing to note her alleged allergy to penicillin. However, there is nothing in the record to indicate whether the resident failed to inquire about any such allegies or whether he did ask but Mrs. Killeen stated she had none. There is evidence in the record that Mrs. Killeen told Dr. Muojo early in the morning hours of December 4 that she was unaware of any specific allergies. Furthermore, the hospital record did, in fact, contain a prominent notation of a penicillin allergy, taken from information in Mrs. Killeen's obstetrical prenatal record (placed there by Dr. Reinhardt who testified that he learned of such allergy in 1968 or 1969) and the possibility that Mrs. Killeen might have been allergic to penicillin was considered by the doctors in determining what drugs to prescribe. Thus, any jury finding of liability on the basis of a failure to take a proper history would be infirm both as respects whether there was such a failure and, if so, whether it was the proximate or a contributing cause of death. Second, and related to the above claim, plaintiff urged that the hospital was guilty of malpractice for failing to countermand Dr. Muojo's order that the drug Cephalotin be administered to Mrs. Killeen. This antibiotic drug was prescribed when she entered into the more critical stage of status asthmaticus, with acute bronchitis, in the early morning hours of December 4. It was

claimed that Cephalotin is contraindicated for one sensitive to penicillin, although it is clear that Mrs. Killeen did not go into anaphylactic shock therefrom. A claimed failure to countermand another allegedly contraindicated drug, Dilaudid, a narcotic cough suppressant given Mrs. Killeen on December 3 by another private physician, was also included within this same theory of liability. The law is clear that a hospital is protected from liability when it follows the direct and explicit orders of the attending physician unless its staff knows that the doctor's orders are "so clearly contraindicated by normal practice that ordinary prudence requires inquiry into [their] correctness" *(Toth v Community Hosp. at Glen Cove,* 22 NY2d 255, 265, n 3). On this record, it cannot be concluded that the administration of both of these drugs was so clearly contraindicated as to cast liability upon the hospital for failing to make further inquiry or prohibit their use. Plaintiff additionally asserted that the hospital was guilty of malpractice in administering adrenalin to Mrs. Killeen early on December 4, which drug was ordered by the obstetrical resident, in failing to treat her anemia, in failing to hold consultations with a pulmonary specialist or internist with respect to her condition prior to December 4 and in placing her in the "wrong ward", i.e., the obstetrical section instead of the medical section of the hospital. The consultation claim would not support a verdict against the hospital if, as appears, the obligation to call in consulting specialists was upon the attending physicians. The so-called "wrong ward" theory was inexplicably charged to the jury after the trial court had previously ruled, and correctly so, that this theory was not properly in the case, there being no allegation as to improper placement in plaintiff's bill of particulars. Since the jury returned only a general verdict against the hospital it is impossible to determine upon which theory or theories of liability the verdict is based. It is clear that the judgment cannot stand inasmuch as the evidence does not sustain a finding of malpractice on several of the submitted theories and the "wrong ward" theory was not properly an issue in this case in the first instance (see *Hamilton v Presbyterian Hosp. of City of N. Y.,* 25 AD2d 431, app dsmd 17 NY2d 719). On the new trial the jury should be directed to return a special verdict or a general verdict accompanied by written answers to written interrogatories (see CPLR 4111), if multiple theories of malpractice are again involved *(Dore v Long Is. R. R. Co.,* 23 AD2d 502). Finally, we hold that the trial court correctly ruled that any verdict against the hospital must be reduced not only by the Reinhardt-Nichlas settlement but also by Dr. Muojo's equitable share of the damages, as found by the jury. The fact that plaintiff discontinued his claim against Dr. Muojo without monetary consideration does not, under the circumstances at bar, take the matter out of the purview of section 15-108 of the General Obligations Law. We also agree that Dr. Muojo's equitable share was properly calculated at $110,000. O'Connor, Martuscello and Mangano, JJ., concur.

Suozzi, J. P., concurs in the result, with the following memorandum: I am in full accord with the majority's holding that the judgment entered in favor of plaintiff and against defendant hospital in the principal sum of $275,000 must be reversed and a new trial granted. However, I disagree with so much of the dicta which states that the trial · court correctly calculated the amount by which the verdict against the hospital, i.e., $650,000, had to be reduced due to plaintiff's settlement of the case against the remaining defendants, Doctors Reinhardt, Nichlas and Muojo. Since Doctors Reinhardt and Nichlas paid $265,000 in settlement, which exceeded their equitable share of the damages (i.e., 30% of the $650,000 or $195,000),

the trial court correctly ruled, pursuant to section 15-108 of the General Obligations Law, that the verdict had to be reduced by the greater of those figures, i.e., $265,000, leaving a verdict of $385,000. For the same reasoning, however, once plaintiff settled his case against defendant Muojo for no consideration—and the majority concedes that such a settlement does not take the matter out of the purview of section 15-108 of the General Obligations Law—the defendant hospital was entitled to a further reduction in the verdict by an amount representing Muojo's equitable share of the damages, i.e., 20% of $650,000 or $130,000 and not $110,000 as held by the trial court and approved by the majority.