MARLENE DIDNER, Individually and as Executrix of SAUL DIDNER, Deceased, Respondent, v KEENE CORPORATION, Appellant, et al., Defendants.

First Department, February 9, 1993

## APPEARANCES OF COUNSEL

*Andrew T. Berry* of counsel *(John C. Garde* and *Debra M. Perry* with him on the brief; *McCarter & English,* attorneys), for appellant.

*Perry S. Reich* of counsel *(Sybil Shainwald* with him on the brief; attorneys), for respondents.

## OPINION OF THE COURT

ELLERIN, J.

On this appeal we are once again confronted with an issue as to how the provisions of General Obligations Law § 15-108 are to be construed in the context of a multidefendant tort litigation, a format that is becoming increasingly common in our trial courts. *(See, e.g., Williams v Niske,* 181 AD2d 307, *lv granted* 186 AD2d 1099.)

The underlying action, which sought to recover damages for wrongful death, pain and suffering and loss of consortium by reason of the death of plaintiff-respondent's husband from exposure to asbestos, resulted in a jury verdict of almost $6,000,000 that was ultimately reduced by the trial court to the sum of $3,917,353. In accordance with the innovative procedures instituted by Justice Helen Freedman, the Trial Judge to whom all New York asbestos litigation had been assigned by administrative order, the trial of the action was held in two stages, with damages being tried first and liability thereafter. The damage verdict was rendered on June 27, 1990 and the verdict on liability, which found that 13 of the 18 named defendants proximately contributed in some degree to the condition that resulted in decedent's death, was rendered on July 10, 1990. Appellant Keene Corporation (Keene) was held to be responsible for 15% of the liability, while the defendant Manville Corporation, Asbestos Disease Compensation Fund (Manville) was found to be responsible for 60.167%. At the time the final verdict was rendered, all other defendants who were found by the jury to have some liability to plaintiff, as well as two defendants who were found not liable, had irrevocably settled the claims against them in a total amount of $2,500,000. In every such instance the payment amount was substantially greater than the proportionate

amount that the jury had allocated to such defendant. Subsequent to the completion of the trial, on August 14, 1990, a consent judgment in the amount of $800,000 was entered against Manville.

On February 5, 1991, a final judgment was entered which required Keene to pay $618,452, a sum equivalent to 15% of the reduced total verdict, plus interest, the proportionate share of liability charged against it by the jury. Keene now appeals from that judgment contending (1) that plaintiff had settled with defendant Manville for $800,000 prior to the final verdict requiring that General Obligations Law § 15-108 be applied in molding Keene's share of the instant verdict; and (2) that proper application of that section requires that the total verdict be reduced not only by the $2,500,000 received by plaintiff from the other defendants with whom she concededly had settled prior to the verdict but also by the additional sum of $2,356,953.80 representing Manville's 60.167% of the liability, resulting in no payment whatsoever due from Keene.

Under appellant's mathematical configuration, plaintiff's maximum permissible recovery out of the total $3,917,353 would be $3,330,000, in the event that Manville pays the $800,000 which Keene characterizes as a settlement. Thus, under appellant's "best scenario" plaintiff would be left with a shortfall of $617,353 from the amount of the reduced verdict. Alternatively, in the event defendant Manville, which Keene itself acknowledges in its brief is an entity created as a result of the bankruptcy of Johns-Manville Company and "has not yet paid the $800,000 which it agreed to pay", were to fail to pay the $800,000, plaintiff's share of the reduced verdict would be some $1,417,353 less than the award which was found to be reasonable compensation for the loss involved. Appellant Keene asserts that in either event it is exonerated from making any payment by virtue of General Obligations Law § 15-108 notwithstanding that the jury found it to be responsible for 15% of the liability and that to thus exonerate it from any responsibility would also result in a marked reduction of the amount of the recovery to which plaintiff was held entitled.

The interpretation which appellant seeks to accord to General Obligations Law § 15-108 is not only at variance with the language of the statute itself but completely ignores its historical genesis and purpose and impermissibly skews the intent of the statute.

■ The first issue is, indeed, whether General Obligations Law § 15-108 applies to this situation, at all.

The provisions of the statute relied upon by appellant Keene are as follows:

"§ 15-108. Release or covenant not to sue

"(a) Effect of release of or covenant not to sue tortfeasors. *When a release or a covenant not to sue or not to enforce a judgment is given* to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but *it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it,* or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest." (Emphasis added.)

While appellant and the dissent assert that the plaintiff "settled with, among others, Manville" on July 5, 1990, before the conclusion of the liability and apportionment phase of the trial, the record before us contains a letter dated July 23, 1990, referring to an accompanying agreed-upon proposed order which simply provided for the entry of a judgment in the amount of $800,000 against Manville. That order was signed on August 6, 1990 and filed on August 14, 1990, well after the final verdict date. Significantly, neither the letter accompanying the consent judgment nor the judgment itself provides for a release of Manville or a discontinuance of the action with prejudice, in distinction to the stipulations and orders in the record covering other defendants, including Owens-Corning Fiberglas Corp. and General Electric, with whom plaintiff did, in fact, enter binding preverdict settlements, nor does the statement quoted by the dissent constitute the kind of specific irrevocable agreement involved in *Lettiere v Martin El. Co.* (62 AD2d 810, *affd* 48 NY2d 662).

Appellant argues that plaintiff's "settlement" with Manville is the precipitating event which renders the statute applicable. Significantly, however, the statute itself nowhere uses that term but instead clearly and expressly predicates its applicability to situations where "a release or a covenant not to sue or not to enforce a judgment is given" to one of several claimed tortfeasors. While various decisions relating to Gen-

eral Obligations Law § 15-108 have used the terms "settlement" or "settled" in applying the statute, the question of the existence of a binding and irrevocable preverdict settlement discharging the settling party from further liability has not itself been an issue in those situations, as is here the case, and the terms have essentially been used as a convenient shorthand characterization. It is the plain and unambiguous language of the statute, however, that is the best indication of the legislative intent and that is controlling (see, e.g., Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451; McKinney's Cons Laws of NY, Book 1, Statutes § 76). The words "release or a covenant not to sue" used in the statute are clear and unambiguous and must be given effect in accordance with their meaning. Those words expressly state that, in multitortfeasor situations, a tortfeasor who proceeds to verdict cannot receive the benefit of a reduction of the verdict under the section with respect to any other tortfeasor's share of liability unless the other tortfeasor's discharge from liability prior to verdict culminates in a release, or a covenant not to sue (which is usually given contemporaneously with either payment or an irrevocable promise for such payment). The statutory language further emphasizes the crucial role of such release or covenant by, in the first instance, expressly conditioning any reduction in the claim against the litigating tortfeasors "to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it".

Reference to the legislative history of General Obligations Law § 15-108 provides an explanatory background of the significance of the particular language used in the statute. The purpose of section 15-108 when originally enacted in 1972 was to ameliorate the effect of the old common-law rule under which a general release given to one of two or more joint tortfeasors was held to release the liability of all even though the others were not named. (See, e.g., Milks v McIver, 264 NY 267; see also, Recommendation of the Law Revision Commission to the Legislature Relating to the Effect of a General Release Without Reservation given to One of Two or More Joint Tortfeasors, 1972 Report of NY Law Rev Commn, 1972 NY Legis Doc No. 65 [k]). To redress a rule which it characterized as "a trap for the average man, who quite reasonably assumes that settling his claim with one person does not have any effect on his rights against others with whom he did not deal", the Law Revision Commission urged enactment of General Obligations Law § 15-108 in order "to provide that

the release means just what it says; if it does not purport to release a party by its express terms, it should not affect his liability". *(Id.,* at 5.) To preclude the possibility of double recovery for a single injury, the statute as enacted in 1972 provided that the claim of the releasor against the other tortfeasors would be reduced "to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater", in recognition of archaic language such as "for one dollar and other good and valuable consideration" that is still used in some releases. It was made clear, however, that the primary purpose of the section was to insure that an injured party not be deprived of full compensation for an injury by virtue of an antiquated arbitrary common-law procedural concept *(id.,* at 1-4).

The subsequent amendment of the statute in 1974 was in response to the decision of the Court of Appeals in *Dole v Dow Chem. Co.* (30 NY2d 143, 150), which significantly changed the law governing contribution by providing for " 'equitable loss sharing by all the wrongdoers' " and thereby rendered a previously released tortfeasor subject to a possible later claim for contribution by another tortfeasor who proceeded to judgment. To address the disincentive to settle which such potential consequence would generate in multitortfeasor situations, section 15-108 was amended in several respects. The section that had been enacted in 1972 was renumbered as subdivision (a) and two additional subdivisions were added, subdivision (b) providing that a release given to one tortfeasor in good faith relieves that party from any claim for contribution, and subdivision (c) providing that "[a] tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person". In an effort to compensate a litigating defendant for loss of potential contribution rights against a tortfeasor who had obtained a discharge from liability prior to a trial resolution of apportionment, subdivision (a) was amended to provide for a reduction of the verdict "to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the *released tortfeasor's* equitable share of the damages * * * whichever is the greatest". (Emphasis added.) The entire thrust of the amended statute continued to focus on the actual "release" of another tortfeasor prior to the verdict as the operative event which would invoke any reduction in the litigating defendant's liability or which would

serve to insulate a discharged tortfeasor from a future claim for contribution.

The decision of the United States Court of Appeals for the Second Circuit in *In re Brooklyn Navy Yard Asbestos Litig.* (971 F2d 831, 843 [Oakes, Ch. J.]) is particularly relevant on this question since the opinion in that case, *inter alia,* discusses the complications and procedures incident to claims against defendant Manville, which was created as a result of Johns-Manville Company's bankruptcy, and specifically addresses the issue of the point at which resolution of such claims impacts on section 15-108 as follows: "The defining moment of settlement, by the clear terms of section 15-108, is when the plaintiff gives a release to the defendant." *(See also, Cover v Cohen,* 113 AD2d 502, 507, holding that the statute is available only where plaintiff had *discharged* one of his tortfeasors prior to the taking of a verdict and entry of judgment.)

The cases heavily relied upon by appellant do not support its contrary position. In the case of *In re Joint S. & E. Dist. Asbestos Litig. (Gallin v Owens-Ill., Inc.)* (760 F Supp 33), the statute was held applicable since a release had, in fact, been given to the released tortfeasor prior to its bankruptcy. In distinction to the case before us, both *Makeun v State of New York* (98 AD2d 583) and *Lettiere v Martin El. Co. (supra)* involve attempts by a settling defendant to obtain contribution from another tortfeasor. In *Makeun,* the injured plaintiff had executed a release in favor of Makeun, as defendant, after a verdict on liability but prior to an adjudication of the damages issue in the case brought by the plaintiff. Having obtained his own release from liability prior to the final verdict, Makeun was held barred by section 15-108 (c) from seeking contribution from another tortfeasor. In *Lettiere,* prior to any adjudication of the issues, defendant Martin Elevator consented to the entry of judgment in a stipulated amount ($250,000), defendant expressly stating on the record that its consent could not be revoked and that a judgment for the stipulated amount would be entered at the completion of the trial notwithstanding any verdict which might be rendered by the jury as to its liability. Under such circumstances, Martin Elevator was held to be precluded from seeking contribution under subdivision (c) of the statute because it had irrevocably obtained its own release from liability prior to judgment. This holding, while properly implementing the contribution provisions of subdivision (c) of section 15-108 among tortfeasors, does not obviate the requirement of subdivision (a) that a

litigating tortfeasor establish that a release or covenant not to sue was given by plaintiff to the other tortfeasor whose share the defendant seeks to deduct.

As indicated, appellant Keene can point to no release given by plaintiff to defendant Manville either prior to, or after, the verdict and judgment were entered. The record demonstrates that because of the bankrupt status of Manville and the consequences stemming therefrom, plaintiff proceeded to judgment against Manville to preserve its ability to obtain as full a recovery as possible. That judgment, however, did not constitute, nor provide for, a release of Manville, prior to its satisfaction. *(See, In re Brooklyn Navy Yard Asbestos Litig., supra,* which emphasizes the need for giving a release in order to effect a settlement with the Manville trust.)

Accordingly, since the record supports the conclusion that Manville's liability had not been discharged in this case prior to the entry of the final judgment we find, as did the trial court, that General Obligations Law § 15-108 does not apply to in any way further reduce appellant's equitable share of the total liability which the jury found to be 15%, precisely the amount which it is obligated to pay under the judgment on appeal. We note parenthetically that if appellant had been directed to pay more than its equitable share of the total verdict, as would here have been possible under principles of joint and several liability, even as limited by CPLR Article 16, it would have had a viable claim for contribution against Manville under the rules enunciated in *Dole v Dow Chem. Co. (supra).* Not having obtained a release of its liability from plaintiff, Manville would be precluded from invoking the insulation of section 15-108 (b) and would, therefore, be subject to such a contribution claim.

■ Although we find that General Obligations Law § 15-108 is not implicated on the present appeal, in light of the concerns which have been voiced about the manner in which the statute should properly be applied in various multidefendant tort litigations which are currently before the courts *(see, e.g., In re Eastern & S. Dists. Asbestos Litig.,* 772 F Supp 1380 [Weinstein, J.], *affd in part and revd in part sub nom. In re Brooklyn Navy Yard Asbestos Litig., supra,* 971 F2d 831), we deem it appropriate to set forth the manner in which we would apply subdivision (a) of the statute if Manville were, in fact, a released tortfeasor—i.e., had obtained a release of its liability for the sum of $800,000.

A paramount consideration in applying the statute is that it be done in a manner that will best effectuate its intent and purposes. As seen from its legislative history, the original enactment of General Obligations Law § 15-108 (in 1972) was designed to facilitate a full recovery by an injured party by abrogating the old common-law rule governing releases. The amendment of the statute some two years later in no way altered that original purpose but additionally sought to implement the *Dole-Dow* principles of equitable apportionment of liability among tortfeasors in a way that would encourage settlements.

The appellant urges that the statutory provisions for reduction of the verdict be applied in the manner that was adopted by the trial court in *Williams v Niske* (147 Misc 2d 556, *mod* 181 AD2d 307, *supra),* that is, on a defendant-by-defendant "pick and choose" method. In this case that methodology would result in a total reduction that far exceeds the amount of the verdict—i.e., $4,856,953.80—and would completely exonerate appellant from any payment while leaving plaintiff with an actual recovery that falls far short of the amount of compensation awarded. This type of result obviously serves to frustrate, rather than to promote, the multiple salutary objectives of encouraging settlements, fully compensating injured victims and equitably allocating liability among tortfeasors.

Presiding Justice Murphy's insightful analysis of the statute in *Williams v Niske* (181 AD2d 307, 310, *supra)* which rejected the trial court's method of calculation, is particularly instructive: "Plainly, the credit provided to the nonsettling defendant by subdivision (a) has no defensible purpose beyond that of assuring that the nonsettlor will not be accountable for more than his equitable share of the verdict; given the overriding statutory objective of encouraging settlement, there can be no conceivable justification for applying subdivision (a) so as to reward a tortfeasor's insistence that the claim against him be reduced to judgment".

Judge Jack Weinstein, the United States District Court Judge in charge of the mass tort litigation in the Eastern and Southern Districts, similarly criticized the "pick and choose" method as follows: "There is no justification for rewarding recalcitrant non-settling defendants by permitting them to apply the General Obligations Law offset in a manner that reduces or even obliterates their own liability in cases where plaintiffs are not fully compensated for their injuries." (772 F Supp, *supra,* at 1393.)

In the context of multidefendant tort litigations, Judge Weinstein, upon careful consideration concluded that the aggregation approach—i.e., where the verdict is reduced by either the total dollar amount of all payments received by plaintiff in return for releases or the total dollar value of the percentages of fault allocated to the settling tortfeasors, whichever aggregation is greater—is the preferable method since under such calculation defendants would not be compelled to absorb more than their equitable share of liability and plaintiffs would not obtain any windfall benefit thereby serving the statute's primary goals of encouraging settlements and preserving *Dole's* equitable fault-sharing principles. *(In re Eastern & S. Dists. Asbestos Litig., supra,* at 1393.)

In *Williams v Niske (supra),* this Court applied a method of computation that best fulfilled the statutory purposes within the context of the particular facts there present. It was made clear, however, that "there is nothing in subdivision (a) which requires the verdict reduction to be accomplished in any particular order" *(supra,* at 311) and that because of the variables inherent in multidefendant litigations it is not possible to formulate one uniformly appropriate method of verdict reduction. In the final analysis, it is the court in the particular case that must determine the method of verdict reduction which best promotes the statute's broad objectives.

In the instant case we believe that the aggregation method would best serve the statutory purposes.

The calculations under that method indicate that the monetary total of all settlements would be $3,300,000 (including the $800,000 charged to Manville under this hypothetical) while the total dollar value of the percentages of fault attributable to the various defendants, other than appellant, would be $3,333,001.47. The latter being the greater, the verdict should be reduced by that amount. Upon such reduction, appellant would be obligated to pay the sum of $584,351.53, an amount very slightly less than its allocated share of 15%, while plaintiff's actual recovery would be $3,884,351.53, some $33,000 less than the reduced verdict of $3,917,353. Since appellant would clearly not be accountable for more than its proportionate share of the verdict and plaintiff's recovery would be substantially in accord with the verdict, the equitable goals of the statute would be satisfied under this equation and the fact that the litigating tortfeasor has not gained a windfall but is essentially held responsible for the share of

fault allocated to it by the jury, after engaging in extensive and expensive litigation, serves to encourage settlements, the other major goal of the statute.

While the aggregation method appears to be particularly appropriate in multiple defendant cases similar to this one, there may be circumstances that will better be served by the procedures utilized by this Court in *Williams v Niske (supra),* and there may also occasionally be situations where use of either method will result in an imbalance, on the one hand, due to improvident decisions by a plaintiff in prematurely releasing certain tortfeasors for inadequate compensation or, on the other, by the impact of joint and several liability principles on a litigating defendant. It should be stressed, however, that the underlying determinant of the particular methodology to be used in applying the statutory setoffs should always be that method which will most effectively serve the statutory purposes of promoting settlements and recompensing the plaintiff as fully as possible without charging a nonsettling defendant with an inequitable share of liability dehors the applicable strictures of joint and several liability.

Accordingly, judgment, Supreme Court, New York County (Helen E. Freedman, J.), entered February 5, 1991, which upon a jury verdict in favor of plaintiff as against defendant Keene Corporation and after reduction by the Trial Judge awarded plaintiff $587,602.95, plus interest, should be affirmed, without costs.

ASCH, J. (dissenting). This action was commenced to recover damages for wrongful death, pain and suffering and loss of consortium, resulting from the death of Saul Didner as the result of his exposure to asbestos. The trial was partitioned into different phases. Thus, in the first phase, the jury was to determine the medical causation and the damages incurred. Immediately thereafter, the jury was presented with the liability issues, i.e., product identification, liability and apportionment among the various defendants. On June 27, 1990, the jury returned a verdict of $3,250,000 for pain and suffering and $1,117,353 for pecuniary loss, as a result of Mr. Didner's death. It also awarded plaintiff Marlene Didner $1,500,000 individually for loss of consortium for a total award of $5,867,353. At a later date, the trial court reduced the verdict to $2,300,000 for pain and suffering and $500,000 for loss of consortium, for a total of $3,917,353.

On June 28, 1990, the liability phase of the trial commenced before the jury. On July 10, 1990, the jury returned a verdict apportioning liability among settled and nonsettled defendants. Defendant Manville (Manville Asbestos Disease Compensation Fund, created as a result of the bankruptcy of Johns-Manville Company to pay claims of asbestos plaintiffs against the Johns-Manville Company) was found to be 60.167% responsible for the damages and defendant-appellant Keene Corporation was assessed 15% of the total amount. The final judgment, entered February 5, 1991, which defendant Keene appeals from, required Keene to pay 15% of the total reduced judgment of $3,917,353, plus interest, or $618,452, without any setoff for the percentage of the liability assessed against defendant Manville.

The first issue we are presented with is whether there was a settlement within the spirit and letter of General Obligations Law § 15-108 between plaintiff and defendant Manville. If so, then defendant Keene should have been allowed a setoff for the amount of the settlement or the percentage of liability assessed against Manville.

Section 15-108 is entitled "Release or covenant not to sue". It provides as follows:

"(a) Effect of release of or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

"(b) Release of tortfeasor. A release given in good faith by the injured person to one tortfeasor as provided in subdivision (a) relieves him from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules.

"(c) Waiver of contribution. A tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person."

Plaintiff contends that several defendants settled prior to verdict but that defendant Manville entered into a consent judgment following the verdict of June 27, 1990, in the sum of $800,000. Plaintiff asserts that while she settled with other defendants, she insisted on taking a judgment against Manville, and that since Manville fully participated in the case, and the judgment was obtained following the jury's verdict, it preserved the plaintiff's ability to obtain a full recovery.

The problem with this analysis is that it ignores the bifurcated nature of the trial. The record clearly shows that plaintiff settled *after* a jury verdict—that of June 27th. However, this verdict was simply for the amount of damages including pain and suffering resulting from Saul Didner's exposure to asbestos. On July 5, 1990, *before* the conclusion of the liability and apportionment phase of the trial, plaintiff represented to the court that she had settled with, among others, Manville. Thus the trial transcript, part of the record before us on this appeal, at pages 405-406, reads, *inter alia*, on that date:

"THE COURT: The plaintiffs in the Didner case, have settled at this time with Owens Corning, Fiberboard—

"THE COURT: We are going to lose Mr. Taber?

"MR. GORDON: Fiberboard and Pittsburg-Corning. Eagle-Pitcher, *Manville Asbestos Disease Compensation Fund,* National Gypsum, U.S. Gypsum, GAF and Armstrong.

"We are still open against Keene, H.K. Porter and Westinghouse." (Emphasis added.)

Thus, on July 5, 1990, plaintiff's counsel made a clear, unambiguous statement on the record in open court that the matter *had* been settled with Manville, precluding further suit against that defendant *(see, Lettiere v Martin El. Co.,* 62 AD2d 810, *affd* 48 NY2d 662). The majority opinion makes much of the fact that plaintiff and Manville entered into a "consent judgment", which did not provide for a release of Manville or a discontinuance of the action with prejudice. However, there is no dispute that plaintiff, on July 5, 1990, in open court, stipulated she "settled" with Manville, and that the case was still "open" only with respect to three defendants, including appellant. This settlement in open court was sufficient to bind plaintiff *(see,* CPLR 2104; *Matter of Dolgin Eldert Corp.,* 31 NY2d 1). Moreover, the very fact that the parties later formalized their valid, open-court settlement by entering a "consent judgment" explains any lack of formal

release or discontinuance against defendant Manville. A judgment would, of course, effectively end any action. The date of this purported "consent judgment", again emphasized by the majority opinion, is of no importance, since the written agreement simply memorialized what had been agreed upon by the plaintiff and defendant Manville on July 5, 1990 in open court, and the settlement was effective as of that date.

On July 10, 1990, *after* this announced settlement, the jury returned a verdict apportioning liability among the settled and nonsettled defendants finding Manville 60.167% and Keene 15% liable.

If, subsequent to a verdict and judgment, plaintiff releases a tortfeasor, the discharge of that tortfeasor will not affect the liability of other defendants. *(See, Cover v Cohen,* 113 AD2d 502, 507-508.)* However, a discharge of a defendant *prior* to a verdict apportioning liability, whether denominated a "release", a "settlement" or a "consent judgment", will not obviate the application of the provisions of section 15-108 to the recovery against the nonsettling defendants. Thus, *Makeun v State of New York* (98 AD2d 583, 591), which dealt with a bifurcated trial, noted that: "the concept of 'liability' in section 15-108 of the General Obligations Law must include a determination of culpability *and* damages. Therefore, the * * * settlement, which occurred after an interlocutory judgment as to negligence only, prior to a final judgment which included damages, constitutes a prejudgment settlement subject to section 15-108 of the General Obligations Law." *(See also, Lettiere v Martin El. Co., supra,* 62 AD2d 810, *affd* 48 NY2d 662.)

The cases relied upon by plaintiff are inapposite. Thus, in *Rock v Reed-Prentice Div.* (39 NY2d 34), the Court of Appeals found that a manufacturer who settled with a plaintiff *after* a judgment still retained a right of contribution against the employer. Here, the plaintiff settled *before* the jury verdict as to liability was entered or even returned. Likewise, in *De Sano v Tower* (129 AD2d 976), plaintiff was shot in the eye with a pellet gun by defendant Tower. The gun was purchased from defendant Saunders. Prior to trial, plaintiff discontinued his action against Saunders, but did not release her from liability, and the Fourth Department accordingly held that the discontinuance constituted neither a release nor a covenant not to sue and plaintiff's claim should not therefore have been reduced pursuant to section 15-108. The Court reasoned that since plaintiff did not settle with Saunders, he could have

recommenced another action at any time prior to the running of the Statute of Limitations. Here, of course, after the settlement reached by plaintiff and Manville, prior to the jury verdict apportioning damages, Manville was relieved of the risk of any further lawsuits by plaintiff and is immune from the claims of codefendants in contribution.

Plaintiff makes much of the fact that the $800,000 settlement reached with Manville "may or may not be collectable". The trial court also noted, in denying defendant's motion to vacate the February 5, 1991 judgment, that Manville would not pay its share and that someone had to pay Manville's share. This was probably factually in error, but, in any event, clearly erroneous as a matter of law. Thus CPLR 1601 (1) provides, *inter alia,* that "the culpable conduct of any person *not a party to the action* shall not be considered in determining any equitable share herein if the claimant proves that with due diligence he was unable to obtain jurisdiction over such person in said action" (emphasis added).

However, Manville took part in this litigation, being represented by counsel, who in fact delivered the "main summation" at the damages phase of the trial, on behalf of all defendants. Moreover, when plaintiff settled for the $800,000 with Manville, she was aware of the difficulties she faced dealing with the Manville Fund at that time. The defendant asserts, moreover, that under the settlement of the Manville class action in Federal court, plaintiff's settlement with Manville in the form of a consent judgment will be paid in full. In any event, as noted by Judge McLaughlin of the Second Circuit, sitting by designation on the District Court, in a case also involving a settlement with Manville: "It is reasonable to infer that those dealing with the Manville trust at the time of this litigation were well aware of its financial problems. Indeed, it is likely that plaintiff knew this simply by virtue of accepting a settlement with staggered payments. Even without such insights, '[e]quity will not relieve a party of its obligations under a contract merely because subsequently, with the benefit of hindsight it appears to have been a bad bargain.' *Raphael v. Booth Memorial Hospital,* 67 A.D.2d 702, 703 [other citation omitted].)" *(In re Joint S. & E. Dist. Asbestos Litig. [Gallin v Owens-Ill., Inc.],* 760 F Supp 33, 35.)

The trial court's decision, here, shifted the burden of plaintiff's settlement risks to defendant Keene, which was not only inequitable but diametrically opposed to the spirit and purpose of General Obligations Law § 15-108.

The second issue, which must be decided since General Obligations Law § 15-108 does apply, is how the appropriate setoff to Keene should be calculated. The plaintiff asserts that the statute does not "directly speak" to this question. However, subdivision (a) of the statute provides, in pertinent part, that the release "reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release * * * or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages * * * whichever is the greatest."

Applying this statutory formula to the present case, defendant Keene's 15% share should have been allowed appropriate setoffs for settlements from the settling codefendants including either the $800,000 Manville settlement or the "equitable share of the damages", i.e., 60.167% of the total verdict of $3,917,353 which was $2,356,953.80. Plaintiff takes the position that the defendant may not "pick and choose" as to the manner in which the statute is applied but that Keene must aggregate all settling defendants by percentages of fault or by settlement amounts in dollars, and a majority of this Court agrees with that position, albeit in dicta. "[C]ontrary to plaintiff's argument that [defendant] must choose with respect to all settling defendants between credit for their equitable liability or the amount paid in settlement, it is clear that the statute imposes no such requirement. The term 'tort-feasor' is used in the singular and the nonsettling defendant is entitled to credit, with respect to each defendant tort-feasor, for the greater of either the amount paid or the equitable liability. Plaintiff argues that, here, such application of General Obligations Law § 15-108 gives defendant BTK 'a free ride', i.e., it is required to pay only $10,000 although its equitable liability was found to be 35% of $2,600,000 or $910,000. The 'free ride' results not solely from the operation of the statute but from the settlements reached by plaintiff with the other defendants. If those settlements had totaled $2,600,000 or more, defendant BTK would have an even freer ride, it would pay nothing. Plaintiff and her attorney made certain decisions concerning the wisdom of accepting a number of settlement offers. In making those decisions plaintiff's attorney was, or should have been, aware of the provisions of General Obligations Law § 15-108, and the impact of those provisions on the amount which the nonsettling defendant might be required to pay after jury verdict." (Williams v Niske, 147 Misc 2d 556, 559-560, mod 181 AD2d 307.)

These principles enunciated by Justice Gammerman in the New York County Supreme Court, while rejected by this Court in *Williams v Niske* (181 AD2d 307, *supra, lv granted* 186 AD2d 1099) and a majority herein, appear to me to adhere to the literal meaning and intent of the statute.

As the IAS Court in *Williams (supra,* at 558) recognized, courts construing this statute have uniformly held that non-settling defendants are entitled to reduce the recovery against them by the full amount of any settlement even if the settling party was found later to be not liable *(Werner v Our Lady of Lourdes,* 60 AD2d 791) or by the equitable share of the damages attributable to the settling party, even if that party settled without paying any consideration *(Killeen v Reinhardt,* 71 AD2d 851). Judge McLaughlin in *Gallin (supra)* is in accord with this defendant-by-defendant calculation of section 15-108 setoffs. In fact, the Trial Judge in the case before us has previously written: "For the reasons articulated in *Williams v Niske (supra), Gallin v Owens-Illinois, Inc. (supra)* and *Killeen v Reinhardt (supra),* this court holds that nonsettling defendants are entitled to consider each settling defendant against whom a percentage of liability was assessed or who paid consideration individually and offset the higher amount in each case." *(Matter of New York City Asbestos Litig.,* 151 Misc 2d 1, 6.) In a learned opinion in the Federal court, relied upon by the majority opinion, Judge Jack Weinstein agreed that the plaintiffs' method of adding separately the value of the settlements and the value of the apportioned shares of liability and then deducting the larger of these two totals from the verdict owed by nonsettling defendants appeared to more closely "fulfill the equitable goals of the statute" *(In re Eastern & S. Dists. Asbestos Litig.,* 772 F Supp 1380, 1393). However, in a review of the applicable case law, Judge Weinstein also came to the conclusion that both the State and Federal courts which have considered the issue have adopted the defendants' position and asserted "[a]t the moment this court must assume that the New York Court of Appeals would follow the holdings of the lower state courts on this issue. The initial statutory interpretation by the state and federal courts has now developed into an unmistakable jurisprudential trend that this court cannot lightly disregard." *(Supra,* at 1397.)

In the calculations using these principles, the reduced verdict must be further reduced by the amount of settlements by the other defendants other than the Manville Fund ($2,500,000).

This leaves a balance of a little under $1,500,000. However, this in turn is reduced by the greater of either the actual settlement amount ($800,000) agreed to with Manville or the percentage of liability attributed to Manville by the jury ($2,356,953.80). This last reduction leaves defendant-appellant Keene with no liability remaining to plaintiff.

Accordingly, I would modify, on the law, the judgment of the Supreme Court (Helen E. Freedman, J.), entered February 5, 1991, which granted judgment against appellant-defendant Keene Corporation in the total sum of $618,452.10, to vacate the award against defendant.

MILONAS, J. P., KUPFERMAN and KASSAL, JJ., concur with ELLERIN, J.; ASCH, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, entered February 5, 1991, is affirmed, without costs.